**UNITED STATES of America,**
**Appellee,**

v.

**Carmine G. DeSAPIO, Defendant-**
**Appellant.**

**No. 158, Docket 34689.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 18, 1970.

Decided Nov. 16, 1970.

---

1. Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

See also D.C., 299 F.Supp. 436.

274

Jack Kaplan, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, Arthur A. Munisteri, James Schreiber and Robert G. Morvillo, Asst. U. S. Attys., of counsel), for appellee.

Maurice Edelbaum, New York City (Edelbaum, Abrams, Feitell & Edelbaum, New York City, Lawrence K. Feitell, and Henry J. Boitel, New York City, of counsel), for defendant-appellant.

Before FRIENDLY, SMITH and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

In December 1968 a grand jury in the District Court for the Southern District of New York returned an indictment against Carmine DeSapio, Antonio Corallo, and Henry Fried. The latter's case was severed because of illness. After a four-and-a-half week trial, Corallo was convicted on one of the three counts charged in the indictment and acquitted on another, and the third count was dismissed as to him; he has not appealed.[1] Appellant DeSapio was convicted on one count of conspiring to violate 18 U.S.C. § 1951, which prohibits the obstruction of commerce by extortion, and 18 U.S.C. § 1952, which prohibits travel in interstate or foreign commerce or utilization of any facility in such commerce to commit bribery, and of two substantive violations of the latter section. More intelligibly stated, the charge was that DeSapio conspired with Fried and others to bribe James Marcus, then Commissioner of the New York City Department of Water Supply, Gas and Electricity to withhold permits sought by Consolidated Edison Company of New York, Inc. (Con Ed) until Con Ed would agree to award construction contracts to Fried's companies. DeSapio was sentenced to a term of two years imprisonment on each

1. Corallo was given a 4½ year prison sentence, the term to run concurrently with the three-year sentence imposed on a previous conviction which was sustained in United States v. Corallo, 413 F.2d 1306 (2 Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969).

count concurrently and to fines of $1,-500 on each of the three counts.

## I.

A summary of the evidence is needed to understand DeSapio's legal contentions. In the interest of keeping this opinion to manageable size, we shall endeavor to limit ourselves to the essentials, although in doing so we necessarily omit much evidence which one side or the other would doubtless deem significant.

The story constitutes a second act in the drama involving Commissioner Marcus and Herbert Itkin, who combined the roles of underworld character and FBI informer, of which United States v. Corallo, *supra,* 413 F.2d 1306, was the first. The evidence in that case depicted how Marcus, hard-pressed by loan sharks, had agreed with Corallo, Itkin, and Daniel Motto to award a contract for the renovation of a reservoir in Jerome Park in the Bronx to a construction company headed by Fried without competitive bidding, in return for Fried's promise to kick back 5% of the price. This success led Corallo, Marcus, and Itkin to agree that similar arrangements should be placed in operation elsewhere. Corallo mentioned that Con Ed was a prime target since it was constantly making contracts and also was requiring permits from the Water Department to dig in city streets. Not long after this, but in ignorance of what had been planned, Con Ed requested Water Department approval of a project to reconstruct and enlarge a power transmission facility known as the "high line," 20 miles of which ran atop the Catskill Aqueduct on a City owned right-of-way in Westchester County.

The first approach to Con Ed was made by Milton Lipkins, vice president of Broadway Maintenance Corporation. At a luncheon he asked Max Ulrich, Con Ed's vice president for public relations, about the company's "relationships" with the Water Department. After saying they were "reasonable," Ulrich indicated two major projects in the offing that would require Water Department approval—the "high line" and a pump storage hydroelectric facility at Storm King Mountain near the Catskill Aqueduct. Lipkins said he had heard the company's relations with the Department were very bad and that, through his friends "who were close to the Department," these relations would be improved if Con Ed would award some 5% to 10% of its business to the Orlando Construction Company, headed by Edward Orlando. Lipkins gave Itkin a somewhat rosy version of his success at the conference. Itkin relayed the good news to Marcus and Corallo, who suggested that if the prospective Storm King construction contracts, estimated at $100,000,000, were awarded to certain construction concerns, the three might share 40–50% of the profits. There is no contention that DeSapio played any role in these preliminaries.

Late in June or early in July, Fried, who had learned of the démarche with Con Ed and was distressed at the prospect of being excluded from the business, asked Marcus to meet him, and Marcus requested Itkin to come along. After some small talk, in the course of which Marcus told Fried to speak to Itkin as if to himself and Fried invited Marcus and Itkin to the forthcoming opening of his multimillion dollar horsefarm in Germantown, N. Y., Marcus left. Fried then asked Itkin why he and Marcus were "fooling around" with little companies like Orlando, boasted of his ability to raise $250,000 for pay-offs on 24 hours notice, and claimed to have the chairman of the New York County Republican party, and DeSapio, past chairman of the New York County Democratic party, on his payroll. Itkin did not immediately take up the lead; instead Lipkins pursued Ulrich, without success.

Early in August, Edward Orlando, who had decided to accept Fried as a "partner" on Con Ed contracts, met with him and Itkin. According to Itkin, Fried again deprecated the Lipkins-Ulrich gambit and said, "[i]f you want to

deal, come up to my farm, and I will introduce you to Carmine DeSapio and then you will be really working it right." Fried recommended a route through New Jersey and accommodations in a nearby hotel. At a meeting in Itkin's apartment on August 15, Corallo expressed to Marcus and Itkin his dissatisfaction with Lipkins' lack of progress.

The opening of the horsefarm on August 20 was attended by approximately a thousand guests. Itkin, who had used the recommended route and hotel, arrived between 1 P.M. and 2 P.M. According to him, while he was sitting with Orlando early in the afternoon, Fried came up to his table and led him off to be introduced to DeSapio. Fried said he had spoken to each man separately and, if they could work together, he would do his end. DeSapio allegedly said Itkin had been handling himself poorly and offered to help if Itkin would agree to work with no one else. Itkin accepted and was sure that Marcus would also; DeSapio gave Itkin his unlisted office telephone number. In his testimony DeSapio admitted that he knew Fried well and attended the opening in the company of Frank G. Rosetti, leader of the New York County Democratic party, and their wives. He claimed that Itkin came up alone, introduced himself as a friend of Marcus, and asked what DeSapio thought of Mayor Lindsay's administration. On two later occasions during the afternoon Itkin gave the DeSapio-Rosetti party lifts to and from the clubhouse. DeSapio did not see Fried except at the clubhouse toward the end of the day.[2]

Soon thereafter Itkin told Marcus that DeSapio had called and would "handle" the Con Ed negotiations. Later in the month Itkin asked Marcus if he knew about the high line; Marcus inquired of his engineers and learned about it for the first time.

Itkin claimed to have met DeSapio on September 6 at the coffee shop in the Biltmore Hotel. DeSapio reiterated his poor opinion of Itkin's and Marcus' tactics and warned Itkin to stay in constant touch with him since he had been getting "insurance contracts" with Con Ed for years.[3] He said the Storm King project was too big for a starter and that the conspirators should use the high line to teach Con Ed the necessity of dealing through them. DeSapio denied this meeting.

On the same day Con Ed's vice president and chief engineer, Duncan, called upon Marcus with respect to the delay since May 9 in approving the high line project. Reviewing Con Ed's request, Marcus indicated there was no problem so far as he was concerned, although he would need added technical data, and instructed Groopman, the Department's chief engineer, to prepare a letter to that effect. Itkin testified that, on his relaying this news, DeSapio was indignant since "[i]t is much too early for me to make a move to impress upon them [Con Ed] they have to come to me" and instructed that the letter be held up. On learning this, Marcus took Groopman's draft letter to the office of the Corporation Counsel, hoping thereby to obtain the desired delay. Instead of pondering about the letter which, even as drafted by Groopman, was merely a consent in principle subject to approval of engineering details and a caveat that Con Ed's contract to use the right of way would have to be renegotiated with the Board of Estimate, Assistant Corporation Counsel Redlich immediately prepared an insert making clear that Con Ed was not to incur any expense in reliance upon the approval in principle until the Department notified the company

2. Rosetti corroborated most of DeSapio's account but had not witnessed the initial encounter with Itkin.

3. The Government contends that the quoted phrase was a code used by DeSapio to describe illegal projects. Although DeSapio had been employed for 10 years by an insurance broker, J. B. Rappaport and Co., this agency, according to DeSapio's testimony, had written no insurance for Con Ed.

that the construction would not harm the Catskill Aqueduct. Marcus decided not to send the letter but rather to hold back for a while and then refer the matter to the Director of the Bureau of Franchises for renegotiation of the fee.

A fortnight later Luce, the new chairman of the board of Con Ed, paid his first official visit to Mayor Lindsay, at Gracie Mansion, encountered Marcus there, and pressed for approval of the high line project. Marcus went back to his office and had the Groopman-Redlich draft typed but did not send it. Itkin testified that the next day he met again with DeSapio at the Biltmore dining room.[4] DeSapio objected again to Marcus' being too compliant. Itkin related the financial pressures on Marcus; DeSapio responded that Marcus should be patient and firm, and that $25,000 would be coming from the high line "for us." He also suggested that in telephoning he would refer to himself as "Mr. Carl" while Itkin should call himself "Mr. Herbert."[5] DeSapio denied this meeting.

Itkin emphasized to Marcus that he must hold back on the letter and would receive $10,000 when the right time came. This would be signalled by Itkin's telling Marcus to "send the letter to my niece Plumps in England."

After a telephone call from Luce pressing for the letter, Marcus referred the matter to the Bureau of Franchises for renegotiation of the fee, the procedure Marcus had earlier contemplated, but not acted upon, in his efforts to delay sending out the letter. He prepared a letter advising Con Ed of this but Itkin told him not to send it. Itkin claimed to have met DeSapio again at the Biltmore on September 29, and said that Marcus was now willing to return telephone calls made by Ebel, Luce's predecessor as chairman of the board of Con Ed and now chairman of the executive committee. DeSapio instructed Marcus to do this at an appointed ·date and time, October 9 at 11 A. M.; DeSapio would notify Con Ed of this in advance through Fried. It was also agreed that Itkin and DeSapio would split the $15,000 of the anticipated $25,000 payment remaining after Marcus' $10,000. DeSapio admitted having once met Itkin near the Biltmore coffee shop in October. He said that Itkin had proposed only that they should use their contacts to get something done about housing mortgage insurance.[6]

Marcus telephoned Ebel as arranged and saw him the next day. According to a report by Itkin to Marcus and Corallo at a meeting on October 11 which Itkin recorded, Ebel had emerged with the belief that the permit would soon issue; Itkin urged that Marcus disabuse him of this by professing outrage at a Con Ed advertisement disclosing that the high line would provide a nine-fold increase in power capacity, a circumstance which, more than ever, would entail a larger fee for the City. Marcus and Itkin testified that Itkin told Corallo at this meeting that DeSapio was to be the new intermediary with Con Ed. Defense counsel argues that the tape recording does not bear this out, and that the references to DeSapio concerned

---

4. Itkin testified that on the preceding day he had met with Fried and Orlando, that Fried knew of the meeting with DeSapio which had been set for the following day, and advised Itkin to "do what he says," and that Fried also gave assurance that he and Orlando "are doing our side with Con Ed."

5. Itkin's secretary testified to frequent calls between September and December 1967, from a woman who said Mr. DeSapio or Mr. Carl was calling. DeSapio denied ever using the pseudonym "Mr. Carl."

6. DeSapio and his secretary accounted for Itkin's finding him at the Biltmore coffee shop on the basis that Itkin had called his unlisted number and the secretary had indicated that he would be there. On the other hand, when interviewed by the New York County District Attorney's office, DeSapio made a statement which, as we read it, said he had called his secretary to find his messages and instructed her to inform three or four people, including Itkin, that he would be in the Biltmore cocktail lounge.

proposed "public relations" contracts with Brooklyn Union Gas Co., alleged by Itkin to have been discussed at the September 29 meeting with DeSapio. Although the tape is subject to more than one interpretation, the references to DeSapio's role with Con Ed are surely not so clear as Itkin's and Marcus' testimony about them.

Itkin testified he then told DeSapio that Marcus would again call Ebel, and DeSapio insisted on knowing the exact day and time. A telephone call from Itkin in New York to Marcus at his house at Beach Haven, N. J., fixed this, and Itkin relayed the information to DeSapio. DeSapio denied all of this.

We turn now to testimony by Con Ed's former vice president in charge of construction, Gerald Hadden, who testified under a grant of immunity. He had lunched on November 3 with Fried, from whom he had received cash gratuities since he had succeeded to the responsibility of preparing the list of contractors permitted to bid on Con Ed construction jobs. Fried told of having heard that Con Ed was having difficulty with the City about the high line, which Hadden confirmed, and thought he could be of some help.

Max Ulrich testified that a week later Sidney Baron, head of a public relations firm with a consulting contract with Con Ed and a long-time friend of DeSapio, invited Ulrich to lunch and asked him to break an engagement to that end.[7] DeSapio was with Baron, who professed knowledge of Con Ed's problems, expressed doubt that Lipkins could assist, but thought DeSapio might be of help in view of his "knowledge and experience in governmental affairs." DeSapio expressed concern that the relations between two such vital organizations as the Department of Water Supply and Con Ed "were not particularly good" and thought he might be able "to act, perhaps, as some sort of a referee * * *." DeSapio admitted that he

was present at the lunch and that Con Ed's problems with the Water Department were discussed, but denied that he had offered to assist.

We now return to Hadden. At another lunch, on November 17, Fried said he might have some friends who could help with the high line problem. Three days later DeSapio joined Hadden and Fried at lunch, asked Hadden to explain the permit problem, and said that maybe he could help. DeSapio's version was that he had come into the restaurant, which was across the street from his office, to look for his employer; that he had greeted Fried who introduced him to Hadden; but that there was no conversation.

Itkin testified that on the same day he spoke to DeSapio on the phone, and DeSapio said, "You can send that insurance policy out," see fn. 3. On November 21 Itkin gave Marcus the prearranged signal, but Marcus did not immediately respond. Hadden testified that on November 22 DeSapio again lunched with him and Fried, asked what Con Ed needed, and inquired whether a letter would do. In his testimony DeSapio insisted there had been only one encounter with Fried and Hadden, which was of the innocent sort described above.

According to Itkin, DeSapio telephoned him later that day in anger because no letter had been delivered. Itkin called Marcus, who had the non-committal letter taken to Luce late that afternoon. Itkin then went to DeSapio's office for the promised payment. DeSapio complained that the letter had been delivered to the wrong person. He called Fried, who advised holding Itkin and Marcus off. DeSapio demurred and told Itkin to come to his apartment two days later[8] when "I will have some of the money even if I have to lay it out in advance until I get it back from * * * Fried." DeSapio denied that any such conversation had occurred.

---

7. The other party to the engagement confirmed that this had been done.

8. The intervening day was Thanksgiving.

Itkin claimed that he went to De-Sapio's apartment as arranged. DeSapio said he had heard the letter was "weak" but was advancing $5,000. Itkin assured him that Marcus would cure any deficiencies. Hadden testified that on the same day, November 24, Fried telephoned him and indicated that the letter had been despatched. When Fried called again on November 27, Hadden said the letter was worthless and sent Fried a copy.

Itkin asserted that on November 29 DeSapio gave him an additional $2,500 but would advance no more until Fried reimbursed him. However, on December 4 he paid another $5,000.[9] DeSapio said that Fried had paid him only partially, that Fried had decided to pay only $20,000 since the letter was so weak, but that he would not reduce his $7,500 share. When Itkin protested, DeSapio said "it is only the beginning with us." DeSapio denied all of this, as well as the meeting described in the preceding paragraph.

Hadden recounted a third lunch with DeSapio and Fried on December 5. He repeated that the letter was worthless. DeSapio said "these people" were "hungry for money." Hadden thought nothing should be paid since the letter was not a permit, but Fried insisted he would still pay $20,000. DeSapio denied being present at any such meeting.

On December 12 Marcus resigned as Commissioner. Hadden invited Fried to lunch the next day and expressed concern. Fried told him not to worry although Fried said he had paid the $20,-000, and gave Hadden $5,000 as a "Christmas present." Fried, Marcus, Itkin and Corallo were indicted on December 18 by a federal grand jury with respect to the Bronx reservoir contract.

It remains only to recount a final episode. On Friday, January 5, 1968, W. Donham Crawford, Con Ed's vice president for purchasing, summoned Fried to his office. Fried was informed he had been dropped from the list of contractors authorized to bid for Con Ed projects. After unsuccessful protests that such action was unjustified because he should be presumed innocent of the charges against him, Fried "out of the clear blue sky" declared "Well, you know $20,000 has been provided to Mr. Marcus and that there was a luncheon at which this matter was discussed and present were CD [to wit, DeSapio] and JH [to wit, Hadden]." Fried added that "this was for the transmission line in Westchester." Crawford reported this to Luce, who informed Hadden, who in turn sent for Fried. The following Monday, January 8, Fried made another visit to Con Ed's offices. He stated to Hadden, and later repeated in Crawford's presence, "You are not involved in this at all." He added that he wanted to see Luce. Hadden was called away. After telling Crawford there was going to be a full exposé of the high line affair, Fried explained that in fact Hadden was involved, and that Duncan and Ulrich knew about the matter. He added that "DeSapio has to be made whole" and "I can take care of that." He renewed his insistence on seeing Luce or some other high Con Ed official to plead for restoration to the bidding list. His request was not granted.

Although counsel for DeSapio points to many weaknesses in the Government's case, notably Marcus' inability either to aid or to obstruct the high line project once he had placed the issue in the Bureau of Franchises, the worthlessness of the letter that produced the alleged payments, and the unlikelihood that Fried would make or authorize a kick-back with no assurance that Con Ed would depart from its competitive bidding procedures, he does not and could not properly contend that the evidence was insufficient for submission to the jury. His argument rather is that the case was a close one and that, in consequence,

9. This included two $2,000 packets of cash in wrappers of the Bank of North America. There was evidence permitting a conclusion that these, which were received in evidence, and their contents had come from Fried.

280

errors that might be regarded as non-prejudicial in an open-and-shut trial would be grounds for reversal here. We will consider the appeal on that basis.

## II.

■ DeSapio's first point concerns the denial of his motion for a trial separate from Corallo's. There is and could be no claim that joinder was improper under F.R.Cr.P. 8(b); the contention is rather that the joint trial so prejudiced him as to render the refusal to grant a severance under F.R.Cr.P. 14 an abuse of discretion. As to this the Fifth Circuit has recently observed, Tillman v. United States, 406 F.2d 930, 935, vacated as to one defendant on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969):

> The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed on review, 8 Moore, Federal Practice ¶ 14.02 [1], p. 14–3 (2d ed. 1968). The defendant must show something more than the fact that "a separate trial might offer him a better chance of acquittal." Id. at ¶ 14.104[1], pp. 14–14–14–15.

■■ DeSapio's claim of prejudicial misjoinder must be appraised in light of the evidence and the positions of the parties. The proof left little doubt that Marcus, Itkin, and Fried were members of a conspiracy in which Marcus—by withholding or delaying the issuance of permits—would induce Con Ed to award construction contracts to Fried who would make payments to Marcus and Itkin in return. DeSapio did not deny the existence of such a conspiracy; he insisted that he had no part in it and that his participation had been invented by Itkin to increase Itkin's own stature with the FBI and other prosecutorial agencies. Corallo likewise did not dispute such a conspiracy; he claimed that he had not been allowed to participate or that, to such extent as he had been, this was simply a continuation of the Bronx Reservoir conspiracy, in which, as the judge

made crystal clear to the jury, it was plain DeSapio was not involved. There was no evidence, and no suggestion, that Corallo and DeSapio ever met or spoke to each other.

Mere statement of these facts sufficiently disposes of most of DeSapio's arguments on this score. Proof of the Bronx Reservoir conspiracy showed that Marcus, Itkin, Corallo and Fried had previously worked out kickback agreements and thus was relevant to prove they could well have been continuing along the same line. But it had not the slightest tendency to prove DeSapio's participation in the Con Ed conspiracy, and it is no abuse of discretion to deny a severance merely because of the remote possibility that the jury might draw so irrational an inference. The same comment applies to references to other kickbacks mentioned in the recording of the October 11 meeting of Marcus, Itkin and Corallo. It is similarly unrealistic to suppose that pre-trial publicity and evidence showing Corallo to have been an underworld character could have "rubbed off" on DeSapio when there was no claim that he had ever had anything to do with Corallo. Such contentions take insufficient account of the intelligence and conscientiousness of the jury, the effective efforts of the judge to keep it on the beam, the skill of defense counsel, and the requirement under F.R.Cr.P. 14 that the defendant demonstrate substantial prejudice from a joint trial, not simply "a better chance of acquittal" at a separate one, Tillman v. United States, supra; 8 Moore, Federal Practice ¶ 14.04[1], pp. 14–14–14–19 (1970 ed.).

The only point deserving further comment under this heading is the claim that statements of Corallo's counsel, particularly in summation, in effect conceded the bulk of the Government's case. Although some of the passages quoted in appellant's brief are taken out of context, we can still understand how "exasperating," to use Judge Medina's apt adjective, United States v. Kelly, 349 F.2d 720, 766 (2 Cir. 1965), cert. denied, 384

U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), the gushing summation for Corallo must have been to counsel who was making a tight defense on DeSapio's behalf. But here again counsel underestimates the jury's awareness of its responsibility to appraise the credibility of the witnesses and the immateriality of what Corallo's lawyer thought about portions of the Government's case, particularly in light of the court's admonition that "the lawyers * * * have no right to make any determinations of credibility of witnesses" and that their "comments were argument only."

## III.

We next consider a variety of claims having the ambiguous role of Itkin as their common theme.

In United States v. Corallo, *supra*, 413 F.2d at 1320–1322, the court was not required to reach similar contentions since it found no sufficient contradiction to Itkin's testimony "that whatever else he might have been doing with the FBI to uncover the machinations of the underworld, he was in this venture entirely on his own and acting wholly without the knowledge of the FBI until he found it to his interest to tell the FBI, after the last installment of the bribe had been paid." The record in this case would not support so broad a finding. At least from mid-summer of 1967 Itkin kept the FBI informed of the conspiracy's progress.[10] Itkin testified on cross-examination that it was always his intention to turn over to the FBI information on deals that had been completed, that he would have pursued the larger Storm King projects on the same basis if that had proved possible, and that his "primary motive was never to make the money." On the other

hand, the FBI never told him what to do. While he was "infiltrating, * * * picking and choosing as it came," the Con Ed venture was his own activity and he "was very definitely a participant." Vericker admitted the FBI knew that Itkin "had obtained illegal money" but denied that it had directed or authorized Itkin to participate in the Con Ed scheme and defended its failure to take earlier action on the ground that Itkin "was giving us a tremendous amount of information on labor racketeers, on hoodlums, and we did have this evaluation problem."

On the basis of these facts, DeSapio asks that, in the exercise of our supervisory power, and also as a matter of due process, we reverse the conviction because, as said in Chief Justice Warren's solitary dissent in Hoffa v. United States, 385 U.S. 293, 315, 87 S.Ct. 408, 420, 17 L.Ed.2d 374 (1966), "the nature of the official practices evidenced here is offensive to the fair administration of justice in federal courts." The FBI's conduct indeed went far beyond the familiar cases of the revenue agent approached with a corrupt proposal who, after reporting it to his superiors and on their instructions, acts out the drama which is closely surveilled and often wired for sound, cf. Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); or of the narcotics agent who plays an equivalent role in a pusher's home, cf. Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). In such instances, while the government agent participates in a transaction having the elements of a crime, it is one without adverse social consequences; there is no intention that the revenue agent will keep the bribe or that the narcotics agent will sell the nar-

---

10. For example, Itkin gave his "contact" in the FBI, Agent Vericker, advance notice of his meeting with Marcus, and Corallo on August 15 and turned over the tape recording of it. The same occurred with respect to the October 11 meeting. In the interval he had been in touch with the FBI two or three times weekly. Dur-

ing the critical period leading up to and embracing his receipt of payoffs from DeSapio in November 1967, Itkin made six contacts with Vericker. In addition, he turned over the two bank wrappers allegedly received from DeSapio on December 4—but not the $4,000 they contained.

cotics. Here the FBI sat by while people extorted money to induce official action, with knowledge that they planned to keep it for their own use. To be weighed against this, however, is the value of the information supplied by Itkin, revealing an extensive picture of corruption in high places, both in city government and in business, which had not theretofore been detected and very likely could not have been exposed in any other way. The difficulties courts have had in explicating and marking the boundaries of the defense of entrapment,[11] see Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L. Ed. 413 (1932), Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848 (1958), and the material in Hall, Kamisar, LaFave and Israel, Modern Criminal Procedure 421–38 (1969), suggest the inadvisability of attempting to develop a penumbral doctrine that would add to the many collateral issues now pervading criminal trials still another, a judicial determination whether the activities of an informer had passed some ill-defined acceptable bounds. Where, as here, there is no claim that the informer's activity infringed any specific of the Bill of Rights or any statute of the United States relating to the conduct of investigations, and the competing considerations are such that we are unable to conclude that it violates the "decencies of civilized conduct," Rochin v. California, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952), such decisions had best be left to the executive branch, which is accountable for its conduct to Congress.

■ A second string on the Itkin bow is that if he was not a genuine member of the conspiracy, much testimony was wrongly received. DeSapio concedes, as he must, that, whether conspirator or not, Itkin could testify to anything that he knew the conspirators did or that DeSapio said in his presence. On the other hand, Marcus' testimony concerning narrations by Itkin would have had to be excluded unless Itkin was a member of the conspiracy. It is contended also that if Itkin was not a conspirator, the jurisdictional basis for the two substantive counts would disappear since these were based on Itkin's travel through New Jersey to Fried's horsefarm and his telephoning Marcus in that state.

The evidence we have summarized warranted a conclusion that Itkin was participating in the conspiracy, even though he was currently reporting developments to the FBI and doubtless did not expect to be prosecuted. Whatever Itkin's motives may have been, and one can infer from the evidence that they were not always entirely consistent, the record clearly supports the finding that Itkin, on his own initiative, entered into an illicit agreement with Fried, Marcus, and others to carry out the high line venture. The contention that Itkin's disavowal of personal monetary benefit was inconsistent with his conspiratorial objective is sufficiently answered by our recent holding in United States v. Peltz, 433 F.2d 48, 51 (1970), that one can be a member of a conspiracy without seeking financial gain from the enterprise—however rare such a conspirator may be. Moreover, Itkin's having received and apparently kept some of the proceeds of the conspiracy casts doubt on his eleemosynary intentions; what he apparently meant by this testimony was that after paying for lunches and the like—his necessary "business" expenses —he had little left for himself.

The judge would thus have been justified in making an independent determination that Itkin was a conspirator and that his narrations were therefore admissible, United States v. Geaney, 417 F.2d 1116, 1119–1120 (2 Cir.1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Instead, after

11. No claim is made on that score. The Government's case was that DeSapio was brought into the conspiracy by Fried and was a willing participant; DeSapio's case was that he never participated at all.

summarizing the testimony he told the jury that if they believed Itkin and Vericker, they should deem Itkin to have been a conspirator, whereas if they did not and determined "that the FBI specifically instructed or authorized Itkin to participate in the Con Edison scheme from the very beginning, then you could determine that Itkin was not a conspirator as contemplated by the law." He also instructed that if the jury determined that Itkin, as an agent of the Government, contrived to travel to Fried's farm via New Jersey and to call Marcus in that state for the sole purpose of conferring jurisdiction on the federal courts, they should acquit on the substantive counts.

Although counsel now criticizes these instructions as too limited, he did not do so when the judge invited an expression of disagreement, but excepted only to the court's refusal to instruct that Itkin was not a conspirator as a matter of law.[12] The defense was not entitled to such an instruction.

### IV.

■ DeSapio challenges the admissibility of several damaging statements made by Fried to Hadden on December 13, 1967 and to Crawford on January 5 and 8, 1968. His contention is that upon Marcus' resignation and indictment, the conspiracy ground to an abrupt halt since the conspirators could no longer utilize Marcus' office as a means of inducing Con Ed to award construction contracts to Fried; any declarations after that time, it is argued, could not be in furtherance of the conspiracy and were therefore improperly received. We do not question that if there were error in receiving Fried's statements,

this would be sufficiently serious to require reversal, since these constituted the only testimonial support for Itkin's story of payments by DeSapio. We do not think there was.

The Government says that the argument here under consideration takes too narrow a view of the conspiracy. The indictment named as one objective that, as a result of informing Con Ed of Marcus' intention to misuse the powers of his office for his own benefit and to the detriment of Con Ed, Con Ed "would enter into contracts with the defendant HENRY FRIED that companies owned, controlled and designated" by him and that such "companies would pay him money in the form of dividends, salary and commissions." The prosecution argues that while Marcus' resignation and indictment indeed prevented any further use of his position for extortion on new Con Ed applications, it did not prevent the conspirators from endeavoring to secure what all along had been the only object of interest to Fried.

If the Government's argument depended on showing that Fried entertained any belief, at least on January 5 and 8, 1968, that he could obtain the high line contract from Con Ed without competitive bidding, we should have to reject it. Fried was far too sophisticated to believe that the new Con Ed management would expose itself to suspicion, or worse, by departing from established bidding procedures in favor of a man just indicted for having given a kickback to the former Water Commissioner. Beyond that, counsel's cross-examination of Crawford made it clear that Fried's objective on January 5 and 8 was simply to be restored to the competitive bidding list.

12. This was the position reflected in Request No. 1 to charge. Counsel's statement must be taken as waiving the more moderate alternative reflected in Request No. 2. Similarly counsel's failure to except to the instruction with respect to travel constituted an abandonment of any point with respect to the difference between the instruction as given and Request No. 3. See Armstrong v. United

States, 228 F.2d 764, 768 (8 Cir.), cert. denied, 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450 (1956); Johnson v. United States, 291 F.2d 150, 156 (8 Cir.), cert. denied, 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961). Cf. United States for Use and Benefit of D'Agostino Excavators, Inc. v. Heyward-Robinson Co., 430 F.2d 1077, 1083 (2 Cir. 1970).

We see no reason, however, why so much should be required. From the time of DeSapio's alleged entrance into the conspiracy at Fried's instance, it was contemplated that the money to be paid to Marcus, Itkin and himself would come from Fried, who would find his compensation in contracts with Con Ed. After DeSapio had advanced money, it was surely an important objective for him to receive repayment as well as his own promised share, and Fried remained the only source. While Fried might have decided to provide this in any event, and indeed once said he had done so, he chose to pursue the possibility that he might maintain profitable relationships with Con Ed by remaining on the bidding list and thereby make both himself and DeSapio "whole." That he believed his relations with Hadden and DeSapio's influence still carried some weight in attaining this more limited objective is apparent from the record. Since there is no evidence that DeSapio had withdrawn from the conspiracy at this time, he must be deemed to have authorized Fried to put this forward. Cf. Pinkerton v. United States, 328 U.S. 640, 646, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). A conspirator who has laid out money in the expectation of reimbursement from another member takes the risk that the latter may make imprudent disclosures in endeavoring to obtain the wherewithal. Such declarations are no less in furtherance of the conspiracy because the prospects of success may now appear dim, the objectives of the conspiracy had become more limited and the hoped repetition of the conspiratorial endeavor was impossible.

We recognize, of course, that actions do not become acts in furtherance of a conspiracy *merely* because a conspirator is seeking a means of meeting the financial obligations he incurred therein, for example, if Fried had been removed from the bidding list of some other company not an objective of the conspiracy and had protested that he must be left on the list since he needed the wherewithal to make DeSapio whole. Here, by contrast, Fried was employing means contemplated by the original agreement —the use of his own and DeSapio's influence with Con Ed to achieve ends within the scope of the venture. This case is thus unlike Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790 (1949) or Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L. Ed.2d 931 (1957), which involved alleged continuing or subsidiary conspiracies "to conceal facts in order to prevent detection, conviction and punishment." 336 U.S. at 443, 69 S.Ct. at 718. Rather than attempting to cover his tracks, Fried was making affirmative efforts to salvage what was left in the enterprise.

V.

■ DeSapio's other challenges to the conduct of the trial require much less comment. One of these concerns an interview by an Assistant District Attorney of New York County. DeSapio had been fully warned of his rights; indeed he was asked to bring a lawyer with him but declined. The complaint is that the interview was recorded and the recording gave rise to the contradiction noted in fn. 6. So long as Lopez v. United States, 373 U.S. 427, 439, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), remains the law, the claim is frivolous.

■ Counsel complains that "much of the cross-examination of DeSapio was acutely concerned with how DeSapio, in fact, makes a living and revealed the Government's preoccupation with depicting him as a back-office fixer and influence peddler having no professional training or skills to speak of except the resources of powerful friendships." If it was, this was permissible in light of DeSapio's description of himself as a legitimate employee of an insurance broker and his denial of Itkin's testimony that he had boasted of having obtained "insurance contracts," see fn. 3, from Con Ed for many years and having "almost everything boxed in in the City" along with his Republican counterpart. The only item where the prosecution

would have overstepped the bounds was what, despite contrary protestations, we must regard as an attempt to put before the jury a well-publicized incident in which newspapers reported during 1957 that DeSapio had left a paper bag containing $11,000 in cash in a taxicab. However, the prompt objection of defense counsel aborted the inquiry before it could assume offensive form and the judge promptly struck out not only what there was of the question but also its predecessor, and instructed the prosecutor to start again.

While the prosecutor's summation was vigorous, it did not exceed the limits of fair argument, see United States v. De-Alesandro, 361 F.2d 694, 697 (2 Cir.), cert. denied, 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966), particularly in light of the emotional summation by defense counsel, and, save on several unimportant occasions, was not made the subject of objection. We have examined the materials which the trial court declined to make available to the defense under 18 U.S.C. § 3500, and find no error in that ruling. Other trial errors claimed by DeSapio have been considered but do not merit discussion.

### VI.

We come finally to the denial of DeSapio's motion for a new trial. Here some further facts must first be stated.

Near the end of its case, the defense called as a witness Harold Daniels, a brother-in-law of Henry Fried. Daniels testified that on August 20, the day of the opening of the horsefarm, he saw Fried at the clubhouse around 1:30 P. M.; that Fried was suffering from an attack of gout and couldn't walk; that he took Fried in his car to a parked school bus, holding forty to forty-five people, which Fried entered; that Fried asked him also to join the bus tours because Fried was physically unable to get in and out to show points of interest to the guests; that the bus made two such tours; that Fried was continuously on the bus until the completion of the sec-

ond tour around 5:30 P.M., when Fried, who was carrying a cane, went to the clubhouse where the dedication ceremonies were held; and that Daniels did not see DeSapio until such ceremonies a few minutes later.

If this testimony was believed, it would have shattered Itkin's account of his meeting with Fried at the horsefarm and also of Fried's having related an earlier meeting there with DeSapio, and would have confirmed DeSapio's testimony that he did not see Fried except at the clubhouse toward the end of the day. With the taking of testimony scheduled to close on the following day, the Government was forced to act with more than deliberate speed. Using the horsefarm guest-book as its source, it obtained four witnesses whom it offered in rebuttal.

Mrs. Gordon Auchincloss testified she saw Fried near the swimming pool on the farm around 2 P.M. and again about an hour thereafter, and thought she had seen him in a tent still later. She was "not conscious" of his using a cane. Monsignor Kane said that, after arriving at the farm around 3 P.M., he met Daniels and visited the latter's mansion nearby. Later he was introduced to Henry Fried at the race track. Ulrich testified that when he arrived at the farm about 2 P.M., Henry Fried was standing at the entrance greeting the arrivals. When Ulrich saw him in the same general location about an hour later and went over to thank him for the invitation, Fried suggested that they look at the indoor track to which Ulrich drove him, and also at his new home, where Fried conducted a 15 minute tour. Finally Sister Ann James, a student nurse at the Carmelite Sisters Home for the Aged and Infirm, testified that "Mr. Fried" had walked over to the swimming pool around 2:30 P.M., and that she did not believe he was on the bus she entered for a tour around 3 P.M. She had previously met Henry Fried, "but not personally," when he visited the Home.

The motion for a new trial was predicated on an attack upon the testimony of

two of the four witnesses. At a hearing on the motion conducted by the district judge, Monsignor Flanagan, who had attended the opening along with Monsignor Kane, placed their visit to the Daniels mansion at five o'clock as opposed to Kane's version of shortly after three. More important, it turned out that Sister Ann James' testimony was founded on a serious mistake. On returning to the Home from the courthouse, she had looked for a photograph that had been taken while she was on the farm with "Mr. Fried." She found this was Richard Fried; he looked nothing like his brother Henry, who had indeed visited the Carmelite Home. She immediately communicated this to the lawyer for the order, John J. Kelly, who had accompanied her to court that morning. He did not advise the court or counsel about this serious error until after the verdict, and then only as a result of an investigation initiated by defense counsel. At the post-trial hearing the Government bolstered its case with testimony by two new witnesses whom it had located in the interval. Richard Staats, the driver of the bus, testified that neither Henry Fried nor Daniels was on it at any time, that Henry Fried was walking about the grounds without a cane, and that Fried came up to the bus and gave him a $10 tip at the end of the day. William Foster, a guest, who also testified that Henry Fried was walking around "meeting the people and talking to the people," identified motion picture photographs he had taken between 3 and 3:30 P.M. In one Daniels appears on the grounds sans Henry Fried, in another Henry Fried is standing with a group sans Daniels.[13] On the basis of this evidence the judge denied the motion for a new trial.

If the motion is viewed simply as one based on newly discovered evidence and free from any question of prosecutorial misconduct, the denial was well within the judge's discretion. This is so whether the applicable test is the formulation of Berry v. State, 10 Ga. 511, 527 (1851), namely, whether the new evidence "is so material that it would probably produce a different verdict, if the new trial were granted" or of Larrison v. United States, 24 F.2d 82, 87 (7 Cir.1928), namely, whether it might have produced a different verdict. See United States v. Miller, 411 F.2d 825, 830–831 (2 Cir.1969), and the cases there cited.[14] While the newly discovered evidence indeed cancelled out the evidence of Sister Ann James, it left the testimony of Mrs. Auchincloss and Ulrich unimpaired and simply created a contradiction with respect to Monsignor Kane's. However the matter might stand if that were all, the testimony of Staats and Foster and the motion picture film constituted such a devastating contradiction of Daniels' testimony that, as the Government suggests, it seems exceedingly doubtful that skilled counsel would even use that in a new trial.[15] Beyond all this, it defies belief that, with a thousand people in attendance at the horsefarm, whose names were available, the defense could find no one but Henry Fried's brother-in-law to testify that Fried was afflicted with gout, was consequently unable to greet his guests, and

13. We have viewed the pictures in the presence of counsel. While we agree with appellant that Fried is not moving, he was standing on the grounds and no cane was visible.

14. The Government points out in brief that Larrison dealt with a situation where a principal prosecution witness had made an affidavit (later repudiated) that he had given false testimony at the instance of Post Office inspectors. This would account for the departure from the Berry test, which the opinion did not mention. In fact the Larrison court denied a new trial. We are inclined to agree that the less severe Larrison test should be confined to cases of prosecutorial misconduct.

15. Apparently Daniels has died but his testimony at the instant trial would, of course, be usable if the defense wished.

had to spend most of the afternoon in a bus—if such were the facts.

■■■ Appellant contends we should apply the less severe test of probable effect which we follow in instances of prosecutorial misconduct. United States v. Keogh, 2 Cir., 391 F.2d 138, 146–147 (1968); United States v. Miller, supra, 411 F.2d at 830–832; United States v. Polisi, 2 Cir., 416 F.2d 573, 577–579 (1969). The items of alleged misconduct are:

(1) That, before testifying, Sister Ann James had been shown a group of four or five photographs including one of Henry Fried on which his name had appeared whereas the others bore no names;[16]

(2) That the prosecution did not reveal to defense counsel that the photographs had been exhibited;

(3) That the prosecutor allegedly concealed that Sister Theresa,[17] who had accompanied Sister Ann James both to the horsefarm and to the courthouse, had been unable to identify the photograph of Henry Fried;

(4) That, as the defense would also have proved through Sister Theresa, Sister Ann James had expressed doubt to the prosecutor about her identification of the photograph which the prosecutor did not reveal; and

(5) That the prosecutor deliberately couched his questions to Sister Ann James in terms of "Mr. Fried," knowing that she was thinking of Richard rather than Henry.

We can speedily dispose of (2). While it might have been better practice for the prosecution to have put the defense on notice of the photographic identification, compare United States ex rel. Phipps v. Follette, 428 F.2d 912, 913 & n. 1 (2 Cir.1970), experienced counsel must surely have been aware of this possibility, and there is no reason to doubt that the court would have allowed a *voir dire* on this subject if request had been made. We can also quickly dispose of (5), on quite different grounds. If the prosecutor had deliberately indulged in any such tactic as the defense claims, this would warrant the most stringent condemnation and appropriate corrective action. But we see no evidence that he did. Sister Ann James had identified Henry Fried's photograph and, so far as the record shows, had said nothing about Richard. The criticism of the prosecutor thus depends on reading into his conduct at the trial knowledge he obtained only later.

The prosecution explains item (1) on the basis that its only available photograph of Henry Fried bore his name, that it endeavored to conceal this from Sister Ann James by arranging the photographs so that the name would be covered, but that there was an unintended slip-up. We find no misconduct in the showing of the photographs; with time running against it, the prosecution had to make do with what it had. It is a closer question whether the slip-up created a duty of disclosure that the mere showing of photographs would not. Here again it is necessary to avoid viewing the prosecutor's actions on the basis of hindsight and to make some allowance for the haste with which he was forced to act.

This leaves only items (3) and (4). Since in our view the court should have allowed Sister Theresa to testify, we will assume *arguendo* that she would have given evidence in accordance with counsel's offer of proof. This was not that Sister Theresa would assert that she had

---

16. Something is also sought to be made of the fact that one photograph was of a woman. While this was a stupid mistake, it obviously was not directed to leading Sister Ann James to make a misidentification of Henry Fried.

17. The court did not allow the defense to call Sister Theresa at the post-trial hearing.

not seen the man whose photograph had been exhibited, but only "that she could not identify any of the pictures because of the length of time," over two years. While the defense might have liked to know this, we do not believe it was so significant that non-disclosure was a breach of the prosecutor's obligation, especially since the defense could easily have learned of Sister Theresa by asking Sister Ann James whether she was accompanied as Sisters usually are. This leaves only item (4). Viewing the matter with the benefit of hindsight, and assuming that the facts were as stated in the offer of proof, we are bound to say it would have been better if the Assistant District Attorney had revealed Sister Ann James' uncertainty before or during her examination. Still this case is a long way from "a considered decision to suppress, taken for the very purpose of obstructing," and even from "a failure to disclose evidence whose high value to the defense could not have escaped the prosecutor's attention," *United States v. Keogh, supra,* 391 F.2d at 146–147. Sister Ann James was one of four witnesses called to contradict Daniels' story, even though very likely the most impressive. Revelation that she had not been absolutely sure of her identification of the photograph, although she was reasonably sure that the man she saw at the horsefarm was Henry Fried, who had admittedly visited the Home, would hardly have been of "high value to the defense." Here, as in the case of the interrogation about "Mr. Fried," the defense embroiders later developments into a sinister cloak over prosecutorial omissions "where hindsight discloses that the defense could have put the evidence to not insignificant use," *United States v. Keogh, supra,* 391 F.2d at 147. As already noted, the prosecutor's conduct must also be considered in light of the defense stratagem of calling Daniels as one of its last witnesses and the consequent need for preparation of rebuttal testimony after the trial recessed that afternoon and before it began the next morning. Prose-

cutors under such stress cannot properly be held to standards quite as exacting as those that may be appropriate when they have had days or even weeks to consider whether a disclosure should be made. We thus do not find this to be a case where the defense is entitled to the benefit of "a fairly low showing of materiality," 391 F.2d at 148, of the newly discovered evidence.

On careful review of the entire record we are satisfied that Carmine DeSapio was accorded a fair trial conforming to law, and that the judge was warranted in refusing to direct a new one. The verdict must therefore stand.

Affirmed.