**UNITED STATES of America,**

v.

**Ronald A. MAYERSOHN, Defendant.**

**66–CR–116.**

United States District Court,
E. D. New York.

May 26, 1971.

Edward R. Neaher, U. S. Atty., E. D. New York, by Vincent J. Favorito, Asst. U. S. Atty., for United States.

Schwartz & Frohlich, New York City, by Michael S. Fawer, New York City, for defendant.

ZAVATT, District Judge.

Five years have elapsed since the defendant was indicted on March 28, 1966 and charged with having violated the Selective Service Act, 50 U.S.C. App. § 462(a), in that he knowingly and willfully evaded service in the Armed Forces of the United States by causing to be submitted to Local Draft Board No. 6, Valley Stream, Nassau County, New York (the Board), false and fraudulent information to the effect that he was a bona fide member of a Reserve Unit of the said Armed Forces (Count One), and with having been a party to the making of that false statement bearing upon his classification (Count Two).

The defendant's motion for a new trial upon the grounds hereinafter enumerated is denied.

After the indictment was filed, (1) the defendant, accompanied by his then attorney, Anthony Atlas, pleaded "not guilty" on March 30, 1966; (2) accompanied by substituted counsel, the late Harris Steinberg (whom defendant retained sometime prior to May 3, 1968 and with whom he had conferred on many occasions with reference to this case), withdrew his plea of "not guilty" and pleaded "guilty" to Count Two before Judge Mishler on July 22, 1968; (3) by substituted counsel, Stanley J. Reiben (Reiben), the defendant filed a notice of motion on September 4, 1968, returnable before Judge Dooling, for leave to withdraw his plea of "guilty" to Count Two and to plead "not guilty" to the indictment (this motion was referred to Judge

Mishler, who granted the motion); (4) the case, having been assigned to me, was set for trial by jury which commenced on October 8 and concluded on October 18, 1968, when the jury, after three and one-half hours of deliberation, returned verdicts of guilty on both counts; (5) the defendant, having been sentenced to concurrent terms of five (5) years on both counts of the indictment on December 20, 1968, appealed to the Court of Appeals from the judgment of conviction, which was affirmed on July 23, 1969, United States v. Mayersohn, 413 F.2d 641 (2d Cir. 1968); (6) the defendant's petition to the Court of Appeals for a rehearing was denied September 5, 1969; (7) the defendant's petition (by new counsel, Michael S. Fawer (Fawer)) to the Supreme Court for a writ of certiorari was denied February 24, 1970, 397 U.S. 906, 90 S.Ct. 903, 25 L.Ed.2d 87; (8) on March 26, 1970, the defendant, by Fawer, served a notice of motion for a new trial, returnable April 3, 1970; (9) by a memorandum order, dated and filed June 30, 1970, the court set August 31, 1970 as the date for an evidentiary hearing on the defendant's said motion; (10) the hearing was held on August 31, September 1, 2, 3, 8 and November 1–3, 1970; (11) defendant's counsel filed his post-hearing memorandum on November 25, 1970.

### The motion for a new trial and hearing thereon.

The primary reasons for holding a hearing on the motion (rather than deciding it on the record, the moving papers and those in opposition thereto) were the serious allegations of misconduct on the part of defendant's trial counsel, Reiben, and his alleged dealings with Nathan Voloshen. Voloshen and one Martin Sweig (Sweig) had been indicted in the Southern District of New York on January 12, 1970 in a fifteen count indictment charging them with conspiracy and related offenses of false personation, conflict of interest and perjury, United States of America v. Sweig, 316 F.Supp. 1148 (S.D.N.Y.1970). Before the instant motion for a new trial,

Voloshen had pleaded guilty before trial to four counts of the indictment. After a sixteen-day jury trial before Judge Frankel, the jury found Sweig guilty on Count Six, one of the perjury counts, on July 7, 1970. In Count Six Sweig was charged with having committed perjury when he testified before a Grand Jury that he did not know Gary Roth, one of the persons named in the instant moving papers for a new trial in this Mayersohn case. On September 3, 1970 Sweig was sentenced to a term of thirty (30) months in jail and was fined $2,000.00. On April 14, 1971 Sweig's judgment of conviction was affirmed. United States of America v. Sweig, 441 F.2d 114 (2d Cir. 1971).

In his moving affidavit, Mr. Fawer charged that the defendant had not been effectively represented because, among other things, (1) Reiben, at the request of Nathan Voloshen, had failed to call as witnesses for the defendant Gary Roth and Steven Jay Novick, two Selective Service registrants "who, like Mayersohn, had paid Miller to effect a change in their classifications"; (2) had "inexplicably consented" to the Government's motion, during the trial, to quash the subpoena served on "the local draft board to produce the Roth and Novick files"; (3) had acceded to the request of Nathan Voloshen not to call Roth and Novick to the witness stand; (4) "did virtually nothing to enforce attendance at trial of a witness of vital importance, Paul Miller's wife . . . after Mr. Reiben spoke to Voloshen"; (5) that Reiben may not have elicited the testimony of Roth, Novick and Mrs. Miller "because of trial counsel's improperly motivated decision to forego this most appropriate line of defense"; (6) that, "In acquiescing to Voloshen's demand, Stanley J. Reiben may have improperly subordinated his primary obligation to his client. In so doing, he gave up an opportunity to prove the veracity of Mayersohn's testimony by the independent evidence to be offered by Roth and Novick"; (7) in his affidavit, Fawer speaks of "the dramatic change in the defense trial strategy,"

because of his conversation with Voloshen; (8) "It is frankly difficult to assess what effect the testimony of Roth, Novick and Mrs. Miller would have had on the jury verdict. However, if, in fact, it would have corroborated Mayersohn and thereby discredited Miller's testimony on the key issue, its effect on the jury's deliberations may well have been the return of a different verdict." The gist of these allegations by Fawer against Reiben was that, in effect, Reiben had sold his client down the river; that, but for Reiben's "improperly motivated decision," "improper subordination of his primary obligation to his client," "dramatic change in the defense trial strategy," the defendant may not have been convicted.

Before the hearing and at the request of the court, Reiben submitted his affidavit, sworn to April 9, 1970, in which he admitted that he was "telephonically contacted by one Nathan Voloshen, over the weekend of October 12–13, 1968," who told him that Roth and Novick were his relatives and that "he did not want them called to the witness stand because it would embarrass him. He advised me that if I acceded to his request, he would, if Mayersohn was convicted, arrange for him to spend one month on a prison farm and then be inducted into the Army for a period of several months." (Reiben affidavit pp. 4–5) Reiben stated in that affidavit the reason why he did not call Roth and Novick:

"The reason for my not calling Roth and Novick to the stand was my subjective determination that their testimony would be deemed inadmissible by the trial court. I advised my client of my conversations with Mr. Voloshen and of my decision not to call Roth and Novick as defense witnesses, although I do not believe that I identified Voloshen by name to my client." (Reiben affidavit p. 5)

Neither the Fawer nor the Reiben affidavit stated what the testimony of Roth or Novick would have been, had they been called as witnesses; whether either of them would have testified; whether Reiben knew that, had he called them, they would plead the Fifth Amendment. Reiben testified at the hearing. Roth and Novick were called to the stand and pleaded the Fifth Amendment. Voloshen, though subpoenaed to attend the hearing, did not appear. In his post-hearing memorandum, Fawer stated that Voloshen "was hospitalized, and his counsel advised that, in any event, his client intended to exercise his Fifth Amendment privilege not to testify." (Fawer affidavit p. 5)

After his scathing criticism of Reiben in his moving affidavit, Fawer, in his post-hearing memorandum, withdrew his claim that the defendant had been denied the effective assistance of counsel. "In view of Mr. Reiben's testimony and the absence of any testimony on the issue from Roth, Novick or Voloshen, defendant herewith respectfully withdraws his claim that a new trial should be granted on the ground that he was denied the effective assistance of counsel." (Fawer memorandum p. 5)

That leaves as the alleged grounds for a new trial on the basis of allegedly newly discovered evidence (1) that the Government refrained from interviewing Mrs. Paul Miller, at the request of Paul Miller and did not so advise defense counsel; (2) that the prosecuting attorney, Thomas O'Brien (O'Brien), misrepresented to the court and to Reiben, during the trial, that the Government could not locate Mrs. Miller, when in fact it had never looked for her; (3) that the testimony of Mrs. Paul Miller at the hearing contradicts Paul Miller's uncorroborated trial testimony; (4) that O'Brien failed to produce for the court's inspection and make available to defendant's trial counsel at the conclusion of Miller's direct testimony section 3500 material in the form of a Federal Bureau of Investigation report as to the events which occurred in Miller's apartment on the evening of his arrest, which contained a report of statements made by Miller at that time; (5) that O'Brien permitted Miller to testify that he had made no "statement" to the arresting

agents when he was arrested on January 31, 1966, when in fact he had made a "statement."

### The Trial

The disputed issue at the trial was the essential element of criminal intent; whether the defendant, who admitted on the stand that he had paid Paul Miller $3,500, paid this as a fee to Miller to serve (as he claimed) as the defendant's "draft consultant" to obtain for the defendant a bona fide membership in a reserve unit of the Armed Forces or whether he paid this money to Miller in order to obtain a reclassification to 1–D by means of the false statement that was filed with his Board; whether, when the defendant received from the Board a notice of his reclassification he honestly believed that he had become a bona fide member of a reserve unit.

The defendant, who registered with the Board on September 27, 1960, is a person of above-average education, admittedly of better than average intelligence (* 862) and above-average business experience for his age. He attended the New York Military Academy from which he graduated with the rank of Sergeant the very year he so registered. Before he received a Selective Service questionnaire from his Board on January 17, 1962 and executed and returned it on January 29, 1962, he had attended New York University during 1960 and had taken evening courses for six months at the New School, Manhattan, New York. While employed by Inner Woven Hosiery Company as a salesman, his employer sent him to take courses on sales at the Fashion Institute of Technology for six months. His business experience to the date of the trial was as follows:

1961–62—accounting clerk with U. S. Plywood;

1962–63—sales trainee at Swank, Incorporated;

1963–67—salesman for Inner Woven Hosiery Company and, for a short period of time, sales representative for three lines of merchandise for men's furnishings stores.

By the time he was twenty-one years of age (1963) he was earning $11,500 a year (862). As of the date of the trial, he had been associated with Management Recruiters as a consultant since October 1968.

When defendant executed and returned to the Board on January 29, 1962 the Selective Service classification questionnaire, he claimed a "spasmatic condition of the gastro intestines." He was classified 1–A and so notified in February 1962.

His father, Henry Mayersohn, a lawyer, died October 8, 1962. In November 1963, the Board mailed to defendant its current information questionnaire, Form 127, which he returned the same month together with a doctor's certificate. This questionnaire was not signed by the defendant but, rather, his name was signed thereon by one Terry Galloway of Woodmere, L. I., N. Y., a girl he knew who lived in the same community in which he then lived, whom he authorized to sign his name (866). In that questionnaire, he again claimed "spasmatic condition of gastro intestines," and the accompanying doctor's letter claimed that the defendant was afflicted as follows: "Severe allergy with acute episodes of asthma since 1955" and "duodenitis or pre-ulcer inflammation of duodenum since 1961." In addition, the defendant made a hardship claim based upon the fact of his father's death, claiming that his mother and brother had been left "with no visible means of support . . . I am now employed in sales in order to ensure the support that is needed . . . This is why I feel that I would be disqualified for service in the armed forces." (867) He understood that he was making a claim that his mother and his brother were dependent entirely on him for support. The defendant testified at the trial that, when he filed this questionnaire, he was classified 1–A and did not want to

---

* Except where otherwise designated, numbers refer to pages of the trial transcript.

be inducted into the armed forces and that he "would have preferred to have a dependency." (864)

Having received this questionnaire including a claim of dependency, the Board mailed to the defendant in March of 1964 its dependency Form 118 to be filled out. The same month, the defendant filled out and returned the same (claiming his mother as a dependent) together with a letter of his mother in which she stated: "my son Ronald's income is vital." The defendant also claimed a dependency status as to his brother: "My brother is going to college which is another reason I feel I am needed at home." The evidence indicates that the defendant's brother was not attending college at that time but that the defendant would send him to college in September if he, the defendant, were not drafted. It is also worthy of note that the Board was furnished no factual data to support the conclusory claim that the defendant's income was vital to his mother; no information as to the father's last will and testament or estate;[1] no evidence to support the defendant's claim that his father's death left his mother and brother "with no visible means of support"; no information as to the amount of Social Security benefits then being received by his mother and brother.

Within one week after the Board received the executed Form 118 and accompanying letter of defendant's mother, it requested the Nassau County Welfare Department (Welfare) to investigate and

---

1. Neither did the Assistant United States Attorney cross-examine the defendant on this score or offer any evidence as to the estate of the deceased father, Henry Mayersohn.

The trial judge has lived for almost all of his life in the area known as The Five Towns. These are five contiguous small communities, one of which is the community known as Woodmere and another the community known as Hewlett. The trial judge has lived in the community known as Woodmere for more than twenty years and is aware of the fact that neither Woodmere nor Hewlett is a poverty area. The population consists of persons in economic strata ranging from comfortable white collar to rich and very rich. During the trial, the court asked no questions of the defendant (or anyone else for that matter) as to the estate left by the defendant's father, despite the fact that the trial judge had his suspicions as to the truth of the dependency claim which the defendant had made.

After having studied the trial record, including Reiben's summation to the jury, the court was curious as to the true facts with reference to the estate of Henry Mayersohn and, *sua sponte*, obtained the following information from the Clerk of the Surrogate's Court of Nassau County:

Henry Mayersohn died testate and a resident of Woodmere, Nassau County, New York on October 8, 1962, leaving a last will and testament dated September 19, 1946 which was admitted to probate by the Surrogate of Nassau County, New York on December 28, 1962 under file number 103,328. The order fixing New York State Estate Tax, dated May 16, 1968, shows that the gross estate was $115,701.00 consisting of the following:

| | |
|---|---|
| Stocks and bonds | $ 55,099.00 |
| Insurance | 16,334.00 |
| Jointly held property | 25,000.00 |
| Miscellaneous | 19,268.00 |
| Total Gross Estate | $115,701.00 |

Allowable deductions consisted of the following:

| | |
|---|---|
| Funeral expenses | $ 1,760.00 |
| Debts | 5,337.40 |
| Losses during administration | 11,650.00 |
| Marital deduction | 48,477.01 |

This left a net taxable estate of approximately $48,477.00 on which New York Estate Tax was fixed at $642.00.

The defendant's mother was the sole beneficiary under her husband's last will and testament and, as a result, received approximately $97,000.00 before State and Federal Estate taxes. It is possible that the widow may have received substantially more than this sum, if she was the named beneficiary in policies of insurance on her husband's life in which the husband retained no incidence of ownership—an estate tax avoidance device not unknown to members of the legal profession.

These facts do not enter into the court's determination of the instant motion. Were a new trial granted, however, it is not unlikely that these facts would be developed at a retrial and seriously affect the defendant's credibility.

**1346**

report as to the dependency claim. On June 1, 1964, Welfare interviewed the defendant and requested that the mother come in for an interview. She failed to appear. The facts set forth in footnote 1 suggest an explanation of her failure to appear. That same month, Welfare reported to the Board that the defendant had claimed during the interview of June 1, 1964 that he was contributing $420 per month toward the support of his mother and brother; that he was earning $10,000 annually; that he will support his brother and send him to college in September; that if he, the defendant, is drafted, his brother will be denied a college education. The fact is that the mother was receiving $5,200 a year Social Security; the brother was receiving similar benefits of $1,200 per year; the mother had received all of her deceased husband's net estate and had remarried on May 4, 1964 (Ex. 1F; 88–96, 739–880) and planned to make her home in California.

The defendant (according to his own admission on the stand) had learned of this impending marriage approximately six weeks prior to the event. The jury could very well have drawn the inference that the defendant knew of his mother's intention to remarry before he made the claim that she was dependent upon his income; that the widowed mother of two sons confided in them shortly after she noted the gleam in her suitor's eyes. But, assuming that she kept this a secret until approximately six weeks before the event (which, conceivably, would fix the revelation shortly after the defendant had filed the dependency claim and before he appeared before Welfare), the defendant's testimony as to why he did not so notify the Board is incredible: "I really didn't think of it." (881)

On June 18, 1964, the Board classified the defendant 1–A. He did not appeal. On the stand he testified: "I presented the facts as they were and I accepted their findings." (It must have been as apparent to the jury as it was to the court that the defendant did not "present the facts as they were" and that he

did not accept the Board's findings.) On July 13, 1964, the defendant was notified to report for a physical examination on August 6, 1964. Shortly after he received this notice and on July 17, 1964, he visited a Dr. Telson from whom he received a letter to the effect that he had a bad back. Three days before the date to report, he also visited a Dr. Schweitzer (884).

On August 6, 1964, when he appeared for a physical examination, the defendant claimed several unverified ailments:

stomach trouble
nausea
back trouble
headaches
asthma
hay fever
venereal disease.
(887)

The examining doctor "noted that candidate has a doctor's certificate dated November 18–63 bec. of allergy. He does not appear allergic, and does not now complain about it today. He has another letter doctor's certificate d.7.-17.64 bec. of pains in lower back. He has no complaints today." "He also has a psychiatric certificate from Dr. Feldman whom he sees for past month at times once a week or other times twice a week. His complaints are all unverified." He was found to be physically acceptable for military service (97–105; 160; 928) and was so advised by the Board by letter mailed on August 19, 1964. (99–103; 891, Ex. 1–H) On August 27, 1964, the Board received a letter from a Dr. Feldman (Ex. 1–J) to the effect that the defendant was "undergoing long-term psychiatric treatment for psychonoeurotic reaction, moderately severe, with depressive features. The nature of his illness is such that it would be psychiatrically contraindicated for him to serve in the Armed Forces at this time." (Ex. 1–J; 104–6; 891–897; 978) (On the stand, the defendant testified that he did not "remember" whether he asked Dr. Feldman to send this letter to the Board or whether the doctor did so on his own initiative (895–

897; 978). In view of Dr. Feldman's letter the Board notified him on September 9, 1964 to report for another examination on September 17, 1964 (108–115; 185–186; 111; 897–899). On September 30, 1964, he was notified again by a Board letter that he was acceptable for military service (Ex. 1–H; 114–115; 147 et seq.; 740–741; 897; 900–902).

On October 15, 1964, the Board mailed the defendant a notice to report for induction on November 19, 1964 (115–116). The defendant testified that when he received that notice he did not want to be inducted (925–926). On October 21, 1964 the Board received through the mail an official form DD44 (*undated*), purporting to come from "Commander, 89th Air Terminal Squadron, Maguire Air Force Base, New Jersey," and purporting to have been signed by "John P. Hillary, Major Air Force Reserve, Administrative Officer," certifying that the defendant had enlisted in the United States Air Force Reserve on October 16, 1964 (the day after the date of the Board's notice to report for induction) and that the defendant "is serving satisfactorily." A clerk at the Board wrote in ink on this DD44 form the date October 16, because it reported that the defendant had so enlisted on that date (119). At that time, local draft boards did not verify these DD44 forms. They assumed that they were duly issued (129, 131, 133–135).

On October 24, 1964 the Board notified the defendant by letter that it was canceling the induction notice "because of receipt of notification of your enlistment in the Air Force Reserves," and reclassified him 1–D on November 17, 1964 (120–127). One classified 1–D may not be drafted. Selective Service Regulations, § 1622.13. The defendant did not communicate with the Board thereafter.

Solomon Gottfried, an associate of Miller, is the person who filled out, signed and mailed the DD44 form to the defendant's Board. (How he met Miller, how both of them executed their scheme and their indictments and pleas of guilty will be discussed later.) He had been identified with the Army Air Force from 1954 until he resigned in March 1962. He was attached to the First Air Force Headquarters, based at Mitchell Field, Nassau County, New York, until 1958 when he was transferred to a reserve unit at Mitchell Field and remained there with that unit until it was transferred to Maguire Air Force Base, New Jersey, in 1960. From that time until he resigned in March 1962, he was stationed at that base as a Master Sergeant in charge of recruitment (559) and had occasion to deal with and was familiar with Form DD44.

He testified that he signed the name John P. Hillary on the instant DD44 form; that, as far as he knew, that name was fictitious; that he mailed the form to the defendant's Board; that he did not know the defendant; that he never met the defendant; that, for his services, he received $200 from Miller.

Master Sergeant Fylstra also testified as to the instant DD44 form. He has been attached to the 89th Aerial Port Squadron (formerly 89th Air Terminal Squadron), Maguire Air Force Base, New Jersey, since August, 1960. He testified that the DD44 form was not issued and/or sent by the 89th Squadron; that there is no John P. Hillary attached to that Squadron; that he knows all of the men assigned to that Squadron; that the defendant has never been a member of or assigned to that Squadron; that an active duty order, dated June 15, 1965, ordering that Squadron to active duty for a period of fifteen days, listed all personnel of the Squadron so activated and that the defendant's name does not appear on the roster of personnel of the Squadron attached to that order (186 et seq.). There was also received in evidence a certificate of the Department of Air Force Headquarters, Air Reserve Personnel, that a search of all available records does not show the defendant as being or having been a member of the Air Force Reserves (Ex. 5).

Gottfried (561) and Master Sergeant Fylstra (186 et seq.) explained the pro-

cedure by which one enlists in and becomes a member of the Air Force Reserve. Units of the Reserve are located at military establishments. One desiring to enlist must *appear in person* at the nearest such unit to ascertain whether there are any vacancies. The applicant is interviewed and given what Gottfried called "a battery of exams." Fylstra was more specific. He testified that the applicant must pass a mental and physical examination. If he passes both examinations, he thereby qualifies and his name is placed on a waiting list if there are no vacancies (571–572). It is the duty of recruiting personnel to fill a unit's table of organization as quickly as possible. As soon as there is a vacancy a qualified person on the waiting list is called to appear at the unit and becomes a member thereof as soon as he is sworn in by a commissioned officer (588). Sergeant Fylstra testified that there were openings in the reserves in 1964 but that it is the policy of the Department of Defense not to accept the application of a registrant who has received his notice to report for induction unless his draft board releases him (192–198).

Gottfried and Fylstra testified as to the duties of a member of an Air Force Reserve Unit. In lieu of a regular three year enlistment, he must serve six months of active duty. Active duty consists of basic training plus either additional training at a school or active Air Force duty for job training. In addition, he must serve in training periodically—usually one weekend per month for five and one-half years. Members of the 89th were and are required to so serve one weekend per month and in addition must serve on active duty fifteen days per year, usually during the summer months (191–192).

It was for the jury to decide what weight, if any, it would give to the defendant's testimony as to his alleged efforts to enlist in a Reserve Unit before he did business with Miller.

He first testified that it was after he had received the Board's second notice of acceptability for military service and before he had received his notice to report for induction that he made telephone calls to reserve units. In response to a question as to why he had not made such alleged calls after he received the Board's first notice of acceptability, he replied that he could not say why he had not done so. Later in his testimony, he testified that he did not remember whether he telephoned reserve units after having received the first or the second notice of acceptability. Later, he testified that he made such calls after having received the second notice of acceptability. He claimed to have telephoned two or three reserve units. He did not remember when he telephoned; what reserve units he communicated with by telephone; the names or designating numbers of any such units; the names of any persons he talked to or whether he had telephoned the 89th Air Terminal Squadron—the reserve unit of which the false DD form certified him to be a member performing satisfactory service. He testified that, when he telephoned reserve units, he was advised that there were no openings; that he could appear at the units and put his name on a list; that some units advised him that there might not be an opening for from one to three months; that no unit assured him of an opening within six weeks to two months; that he did not visit any reserve unit to put his name on the list. Asked why he did not want to wait a few months for an opening in a reserve unit, he replied at the trial: "Well, I felt that I would be called up for induction into the service." (746; 847; 908–921)

This is the man who represented to Judge Mishler on July 22, 1968 through his then attorney, the late Harris Steinberg:

". . . this defendant is anxious to be inducted voluntarily. He has been for some time, and just the pendency of this case has prevented it." (Transcript of hearing before Judge Mishler, p. 9)

If he had in fact wanted to enlist, Judge Rayfiel, before whom he pleaded not guilty, would have entertained an application to adjourn the date for pleading to afford him the opportunity to do so and Judge Mishler, I am equally certain, would have entertained an application that his plea of not guilty be permitted to stand and the trial adjourned for a reasonable time to afford the defendant an opportunity to be inducted voluntarily. It was painfully apparent at the trial that, despite Mr. Steinberg's belief, the defendant never wanted to be inducted at any time.

Defendant testified that he never visited any reserve unit to enlist; never went to the 89th Air Terminal Squadron; was never sworn in; never attended a meeting of the 89th; never received any basic training; was never issued a uniform; never received a communication from the 89th; that no suspicion was aroused by the fact that he was never called for any duty (958–961). He did know that, while at the New York Military Academy, he was issued a uniform and attended drills. He did know of a friend who was a member of a control group of the National Guard based in St. Louis, Missouri. When asked whether his friend was sworn in, his answer was "I imagine he was." (923). The jury could draw the inference that the defendant knew that one must be sworn in in order to become a member of a reserve unit as well as of a National Guard control group; that the defendant never believed he had become a member of a reserve unit; that he did not "consult" Miller and pay him $3,500 for any such legitimate purpose. The court readily understands how the jury arrived at its verdicts of guilty after such a short period of deliberation.

The jury heard the uncontradicted testimony of Solomon Gottfried as to how he became associated with Paul Miller in the business of filing false DD44 forms with local draft boards and the part he played in the scheme.

Gottfried first met Miller's father, Sidney Miller (Sidney), in 1960 shortly before Mitchell Air Force Base was closed. In 1962, a few months after Gottfried had resigned from his position at Maguire Air Force Base, Gottfried visited Sidney at his home, in response to a telephone call from Sidney. Sidney explained a scheme he had whereby registrants could be classified 1–D by the submission of false DD44 forms to local draft boards. He gave Gottfried a number of such forms and of United States Government franked envelopes. Gottfried agreed to fill out such forms at Sidney's instructions and mail them to the appropriate local boards. Gottfried possessed a number of such forms as recently as two weeks before he was arrested.

He first met Sidney's son at his father's funeral, Sidney having died in January 1964. A few weeks later, when he paid a condolence call at the home of Mrs. Miller, Sr., he met Paul Miller who asked Gottfried what he had been doing with his father insofar as reserves are concerned. He knew that what his father was doing was illegal, but did not know how he did it (423–427). Gottfried explained the scheme to Paul; that the registrant who was certified in the false DD44 form as being in a reserve unit, was not, in fact, in such a unit. Miller agreed to carry on with Gottfried where his father had left off. Gottfried informed him that he had DD44 forms; that, as Miller gave him the information to be inserted in the forms, he would fill them out and send them to the appropriate local boards (422; 427–428; 433 et seq.).

On October 15, 1964, the Board mailed to the defendant a notice to report for induction on November 19, 1964. It contained a printed instruction to the effect that, if the registrant is a member of the National Guard or a reserve component of the Armed Forces, he should submit such evidence to the Board (955–957). It is to be noted that the Board was located at Valley Stream, Long Island, and that the defendant lived at Woodmere, Long Island, only a few miles from the Board, which was

easily accessible by automobile and telephone. Nevertheless, he did not communicate with the Board nor did he submit to it any evidence of his membership in a reserve component of the Armed Forces or in the National Guard. He testified that he did not do so because he had previously dealt with Miller and knew that the order to report for induction would be canceled. He also testified that when he received that notice he did not want to be inducted (926).

The defense, in its attempt to negative any criminal intent, made much ado as to the question of whether the defendant consulted Miller before or after he had received the Board's notice to report for induction. The jury heard the testimony of Miller and of the defendant on this score. This issue is not material to the instant motion.

Defendant testified that he contacted Miller (who then lived in an apartment at Far Rockaway, Queens County, New York) because it was common knowledge in the area where the defendant lived (Woodmere-Hewlett) that Miller was able to get people into reserve units (746–747). Yet, he could not name one person in that area from whom he had heard this alleged "common knowledge" (930 et seq.). It is passing strange that not one person from that area (or from anywhere else) was called to so testify. It is passing strange that Reiben's "investigator" did not explore the Woodmere-Hewlett area for any such witnesses or, if he did, that not one such person was called to so testify at the trial.

Defendant testified that he called Miller on the telephone. "I told him I would like to come over and see him, I would like to discuss something of some importance. He said 'Fine'" (747); that he said to Miller "I would like to come over and speak to you about something that's mutually important to both of us" (932).

Miller testified that the defendant came to his apartment in Far Rockaway during the last week of October 1964, after he had received his notice to report for induction and about one month before the date he was to so report; that the defendant said that he wanted Miller to keep him from going into the service (209; 221; 269); that he, Miller, told the defendant that he could accomplish what the defendant wanted by submitting a fraudulent DD44 form to the effect that the defendant was in a reserve unit; that the reserve unit would not hear of him; that, when the Board received this DD44 form, he would be reclassified 1–D and the Board would cancel his induction notice (210–211; 222) within one month to six weeks after having received the false report that he was in a reserve unit. "In the defendant's case, since he had received his draft notice, I told him he'd have to come up with the cash immediately so that the form DD44 could be sent in to his draft board" (269).

Defendant testified that, at that first meeting, Miller wanted $5,000 (936) but that they settled on a lesser figure of $3,500 (945). In response to a question as to whether he thought there was something wrong in paying Miller $3,500 to get him into the reserves, the defendant said "Yes, sir"; that he didn't consider it was a bribe "because he was acting as consultant and I was paying him a fee to use his influence" (944–945). Defendant insisted that Miller told him that he would actually get him into a reserve unit and that he specifically mentioned the unit to be the 89th Air Terminal Squadron (751). Miller testified that he had never seen a DD44 form and did not know what unit Gottfried had stated in the fraudulent form as the unit of which defendant was a member performing satisfactory service. Asked why he didn't apply to the 89th himself, the defendant testified that he was willing to pay money to Miller without even applying to the squadron Miller said he would put him in (943 et seq.).

At the first meeting, defendant gave Miller the information about himself that is on the DD44 form (not including the representation as to his member-

ship in a reserve unit). "I authorized Miller to take action in my behalf. I knew that some information would have to be sent to the Board about me" (952 et seq.).

Reiben sought to establish, or at least to imply, that the United States Attorney for this District or one or more agents of the F.B.I. had told Miller to testify falsely; that, either directly or indirectly, they had told Miller that he had to testify that he told registrants that a false DD44 form would be submitted, in order for the Government to obtain a conviction in these Miller cases. He confronted Miller with his testimony in United States v. Eckhause, before Judge Judd on September 18, 1968 in which he said that a United States Attorney *may* have said that it was necessary to prove a false DD44 form in order to obtain a conviction. This was taken out of context in the hope of persuading the jury that the United States Attorney did say what Miller testified *may* have been said and that the jury would conclude from this that the United States Attorney was speaking not merely of an essential element of the crime but, rather, was advising Miller to testify falsely. On redirect, however, Miller testified that O'Brien had advised him to tell the truth; that he had never told him to testify falsely in the Mayersohn case or in any other "Miller-type" case O'Brien had tried (510).

Miller was asked whether anyone else was "present" when Mayersohn first visited him. He replied, in the presence of the defendant, that he was not certain (208). Reiben asked no questions of Miller as to whether his wife or anyone else was in the Miller apartment while the defendant was there; where, in the apartment, anyone was; whether any person "present" could have heard the conversation between Miller and the defendant. Before the defendant testified and in the absence of the jury, I called this fact to Reiben's attention whose re-

ply was: "Why do I have to ask Miller? I will ask her [Mrs. Miller] squarely if she was present" (670). When the defendant took the stand, he testified that Mrs. Miller was "present" (747–748), during the entire conversation between defendant and Miller which took place in the living room. Reiben's question as to the "presence" of Mrs. Miller and the defendant's answer would appear to have been calculated to create the impression that she was in on the conversation. Her testimony at the hearing negatives any such inference.

At the hearing on the instant motion, Mrs. Miller testified that, over the years (56 *), she was in their apartment six to eight times when Miller met with boys of draft age (45); that she was "not a part of the meeting" (56). Her best recollection was that the meetings were in the living room while she was either in the kitchen or the dining area off the living room (57); that what she heard she picked up in bits and pieces because she "eavesdropped." She could not remember in which of the several apartments they had lived when she "eavesdropped" or who the boys were. She testified to one occasion (where or who the young man was she did not remember) when she heard Miller say "that he knew a lot of people in the service and that he could fix anything they wanted" (64). She testified that she never heard Miller tell any "boy" that he would secure his reclassification by submitting a phony or fraudulent or forged form to the draft board, or that he would have the "boy" placed in a phony or nonexistent reserve unit. Nor did she "ever once hear him mention a Form DD4" [sic] or mention "submitting any form or any piece of paper to the draft board (67–69)."

Apparently, Miller was secretive in his dealings with his customers. Mrs. Miller testified that, even when she was in the apartment, he usually greeted them at the door as they came in. "He also

---

* Numbers, with reference to testimony of witnesses at the hearing on the motion for a new trial, indicate page numbers of transcript of that hearing.

**1352**

made it a point to answer the phone all the time when he was home." (130) Miller never asked her to leave the room when a "gentleman" was in the apartment with him. ". . . but he did say that he wanted to talk to his friends. He didn't have to come out and say 'leave the room.' He let me know that he would prefer to be alone" (132). When a visitor was ready to leave, Miller escorted him to the door (135). She does not remember Mayersohn. "The only time I remember seeing Mr. Mayersohn was here, was when I saw him just before I came to court" (133).

Her "presence" in the apartment can hardly be claimed to be newly-discovered. The defendant had had two prior attorneys, Mr. Atlas, followed by the late Harris Steinberg. On argument of the motion before Judge Mishler for leave to withdraw the previously entered plea of guilty, it appeared that Mr. Steinberg and an associate had conferred with the defendant on several occasions. Mr. Reiben was retained some time before that motion was made. The defendant must have been questioned by Reiben and also his former attorneys as to who, if anyone, was "present" when he visited Miller. If the defendant's testimony at the trial that she was "present" was not prompted by the testimony of Miller, Reiben and the defendant knew before the trial that they would claim that she was "present."

At a side-bar conference during Reiben's cross-examination of Miller, Reiben said to the court:

"When I will get through with the evidence I have for the defense he (Miller) is going to be the biggest liar that ever came into a courtroom" (294).

When the Government rested during the morning of October 14, 1968, Reiben advised the court (in the presence of the jury) that he had five witnesses under subpoena; that his process server, who was due in court, had his entire file with him (showing dates of service, telephone numbers, etc.); that he, Reiben, had seen the affidavits of service and knew that all of these witnesses had been served with subpoenas during the early part of the previous week (605–608); that he had "a whole string of subpoenas here with affidavits of service and I have not one witness present" (633); "If the jury can be excused, I would like to ask the court's help in bringing in witnesses who refuse to obey" (626); "I have nine or ten subpoenas here, not one of which has been honored by a witness" (664). Reiben did not state who were the witnesses so served or advise the court as to whether his process server arrived in court. No such process server testified or otherwise advised the court as to what persons had been served with subpoenas to attend and testify. Nor did Reiben so advise the court, except as to a subpoena duces tecum served on the said Board to produce their files with reference to Gary Roth and Steven J. Novick (the registrants who later pleaded the Fifth Amendment at the post-trial hearing). When O'Brien moved that morning to quash that subpoena, Reiben (in the presence of the defendant) withdrew the subpoena. Reiben did not state whether or not he had had Roth and/or Novick subpoenaed to testify at the trial (636).

He also advised the court that same day that Debra ** Miller had been served with a subpoena on October 11th to appear on the 14th; that she "was present at any number of conversations held with these registrants" (668–669; 798; 804). No proof of service of a subpoena on Mrs. Miller was exhibited to the court. When Reiben stated to the court that Mrs. Miller "was present at any number of conversations held with these registrants," the following colloquy occurred:

"The Court: Who said so?

Mr. Reiben: Deborah Miller.

** "Debra" is the correct spelling of Mrs. Miller's first name, but in transcription, it has also been spelled "Deborah."

The Court: Well, if you knew that, why didn't you subpoena her long ago? (This was addressed to Reiben.)

Mr. O'Brien: Because, in my opinion, your Honor, we could not find Deborah Miller.

Mr. Reiben: I found her, and at no great problem; no problem at all." (669)

O'Brien's response to the question I put to Reiben is one of the grounds claimed by defendant to entitle him to a new trial.

That same day, Reiben advised the court that one Edward Bienen had been served with a subpoena the previous day (804); that Bienen had told Reiben's investigator that he was present at a meeting in Teaneck, New Jersey, where Miller had lectured to a group "on his expertise with the draft, that he had good connections with the brass and that he had the ability to obtain reserve status for registrants" (799) and that his investigator had Mr. Bienen's sworn affidavit. No such person appeared to testify. No such affidavit was exhibited to the court.

Reiben also advised the court, that same day, that he had served one Mark Blau of the Bronx with a subpoena on October 12th (797); that Blau had enlisted in the reserves legitimately but had told Reiben's investigator that he knew about Miller (797–821). It was not stated what Blau knew about Miller. No proof of service of a subpoena upon Blau was produced. Nor did Blau appear as a witness.

Reiben also mentioned a Mr. Gross, the manager of a store at which Miller had worked, and represented that Gross had volunteered to appear and to testify to the effect that Miller had made the same type of statements in his presence as to his contacts that he had made in Teaneck (821–823). No Mr. Gross appeared as a witness.

It is worthy of note that Reiben did not question Miller as to any subject upon which any of these witnesses were to testify.

The following day, October 15, 1968, Reiben represented to the court that his investigator had reported to him that, when he served a subpoena on Miller's mother-in-law, she told him that Miller told her that he "was in the Army and had a great deal of pull, and that pull developed on the great deal of contacts on the matter he [Miller] has already testified to and some other matters." (788)  Reiben corrected this, stating that Mrs. Miller would testify "That Paul Miller informed her on numerous occasions, that his father was a general in the Army with a great deal of pull and that he had developed a great many contacts" (789). No proof of service of a subpoena on Miller's mother-in-law was exhibited to the court, nor was she produced as a witness. Reiben also represented that he had served two subpoenas the previous morning "one of which I withdrew" (804). Neither of these alleged witnesses was identified.

A few days previously, the court had learned from Reiben that whatever subpoenas had been served were in the form of Blumberg subpoenas not in conformity with Rule 17 of the Federal Rules of Criminal Procedure. Since none of the witnesses had appeared (if indeed any of them would ever appear and testify as Reiben had represented they would), I had suggested that he have proper subpoenas issued by the Clerk.

The following day, after Reiben had called his last witness (Jerome Telson, the defendant's brother-in-law) as a reputation witness, Reiben stated to the court that he had received a telephone call at his home at 8:30 A.M. from "an investigator," advising him that "he had effected some service and he would be here himself.  He was looking for people now," (1007–1009). I asked Reiben if Miller's wife had been served with a proper subpoena, to which he replied: "I don't know there was no answer at either home. He [the process server or investigator] was on his way to Court Street and he was to effect service im-

mediately and he had still one more lead." As to the two New Jersey witnesses, they had not been served (1009). "The only thing we have left is the motion . . . to dismiss," (1009). Reiben said nothing about producing Debra Miller, Miller's mother-in-law, or any of the other persons he had mentioned previously as witnesses for the defendant. After Reiben had moved to dismiss on various grounds, both sides rested and counsel were directed to sum up the following day.

> "The Court: So the defendant is resting and the government is resting, is that correct?
>
> Mr. Reiben: Correct.
>
> Mr. O'Brien: Correct." (1009).

The following morning, before the jury was brought in, Reiben informed the court that he had received the minutes the previous night and called the court's attention to a typographical error in the transcript as to the defendant's description of Miller's wife:

> "The Court: Could you describe the wife for us?
>
> The Defendant: No, Sir, I believe she was blind."

The defendant had said he believed she was blond. Whereupon I addressed Reiben:

> "The Court: Are you going to make a big tzimmes [sic] about the wife?
>
> Mr. Reiben: No, Sir." (1047)

### The motion for a new trial.

Debra's whereabouts during the trial was apparently a dead issue for nearly two years after the conviction, until, suddenly, like Lazarus, she arose from the dead to become the central figure (absent Voloshen) in what defendant would have us believe was a vicious Government plot to incarcerate innocent boys through a combination of intentional and negligent errors.

To appreciate the evanescent nature of Debra Miller as well as the enormity of the claimed Government blunders perpetrated (albeit indirectly) with reference to Debra the court must turn back to the events following Miller's arrest in January 1966, and trace the parallel paths taken by the Government (the F. B.I. and United States Attorney) and defendant's trial counsel.

Agent McKenna, who headed the entire F.B.I. investigation of the numerous so-called "Miller cases," testified at the hearing. He understood that any case that proceeded to trial would depend in large part (although not exclusively) on the uncorroborated testimony of Miller as to what he told the registrants. He clearly could have used any corroboration from Debra, who was allegedly "present" in the apartment while Miller conferred with some of the "boys," to bolster his case. The F.B.I. had reason to believe that Debra was knowledgeable about her husband's affairs due to information in the possession of the F.B.I. to the effect that both Debra and her husband had bragged that Miller "could get people out of the draft just as his father used to do before he died." Prior to the arrest, the F.B.I. had also pieced together Miller's modus operandi through coordination of apparently unrelated incidents. Part of the information garnered by the F.B.I. included two statements, independently and voluntarily given, by young men, in which they stated what Miller told them about his scheme when he met with them.

Although McKenna would have liked to speak with Debra, this was not a necessity in light of the other information already at his disposal. In any event, the question of interviewing Mrs. Miller was obviated soon after her husband's arrest, when McKenna received a phone call from Arthur Hammer, Miller's attorney, in which Hammer requested, on behalf of his client, that Miller's family not be encompassed in the F.B.I. investigation. This call placed McKenna in an obvious dilemma—Miller was willing to cooperate, and his cooperation was essential to the prosecution of nearly 60 cases. On the other hand absent corroboration from Debra, the Government's case would have to rest largely on Miller's word alone. Thus, McKenna

had to decide whether to risk Miller's cooperation by interviewing his family, or to risk prosecution without corroboration, if he acceded to the request.

Much was made at the hearing as to whether the F.B.I. should have acceded to Hammer's request as it ultimately did. Suffice it to say that, regardless of whether acceding to this "request" was illegal (which it was not) or whether the request was a veiled threat, or whether hindsight shows that McKenna made an unwise decision, the decision of Mc-Kenna is not at issue here. As McKenna testified at the hearing, the real interest of the F.B.I. was in interviewing Mrs. Miller Senior (Paul's mother-in-law). This was due to the fact that Mr. Miller Senior—her husband, and the inventor of the DD44 scheme—was deceased. Any hopes that the Government would have in prosecuting boys who dealt with Paul's father would necessarily rest on her knowledge and testimony. However, the F.B.I. did not know, what, if anything, she knew, and even if she had such knowledge, their chances of prosecuting boys who dealt with Paul's father were slim. Debra was not necessary in this sense—the Government had Paul who was not only alive, but also willing to cooperate. Furthermore, McKenna had no reason to believe that Debra would say anything to contradict her husband's version of the events.[2] In weighing these competing considerations, the court cannot say that McKenna made an unwise decision not to interview Miller's wife. In short, he had more to gain by acceding to Miller's request and too much

to lose if he did not. This decision was sometime thereafter communicated to the office of the United States Attorney.

It must be borne in mind, when considering McKenna's decision, that he must have known that he was taking a calculated risk. Not only did he lose any potential corroboration as to what Miller told the boys, but also the possibility existed that any registrant who claimed that Debra was present during the conversations could call her as a witness, if, in fact, her testimony contradicted that of Paul.

Whereas Debra ceased to concern the Government after McKenna's decision, she became increasingly important to the defendant as his trial drew near. Reiben, who testified at the hearing that he knew that Debra had been present in the apartment during some of Miller's conversations (garnered from his involvement in an early Miller case) must have been advised by his client that she was "present" while the defendant was in Miller's apartment. Reiben, an experienced attorney, undoubtedly realized that he had everything to gain and nothing to lose by interviewing Debra. If she corroborated Paul's story, he did not have to call her as a witness; if she contradicted it, he would have an ace in the hole.

Enter Theodore Ratnoff, part-time investigator, part-time process server, part-time investigative reporter for Life magazine (ironically, for the purpose of exposing corruption in high places) and, depending on whose version of the

---

2. While Miller and the three arresting F.B.I. agents were en route to the Federal House of Detention at West Street, New York City, on the evening of the arrest:

"Miller stated that he and his wife had got wind of the fact that the Federal Bureau of Investigation was investigating him, and only last night they had debated whether they should flee from the United States and go to Mexico. He decided not to flee. He stated that he knew it was only a question of time, that he was bound to be caught in the end. He asked, 'But why is it

in over eight years you never caught my father?' "

This quotation is from the report of Agent McKenna which the defendant claims should have been turned over to him as Section 3500 material, after Miller's direct testimony was concluded. See footnote 3, infra.

In light of this statement made by Miller on the evening of his arrest, one can readily understand that Agent McKenna had no reason to believe that Debra would contradict her husband's version of his nefarious scheme.

events one believes, full-time liar or full-time incompetent. Ratnoff was retained by Reiben in the month preceding the trial, one of his functions being to locate and interview Debra. When Ratnoff reported that he had located Debra, Reiben instructed him to find out what she knew. Ratnoff returned with information; Reiben "clicked his heels in joy" (798-799); she had been present during conversations that Miller had had with the registrants and never heard him mention to any of them DD44 forms or the submission of false forms. Reiben advised Ratnoff not to serve Debra at this point but to wait until the time of trial. Ratnoff's subsequent service on "Debra" and her failure to appear on the return day have already been discussed. At the hearing, Ratnoff testified that, having seen Debra in the court house during the hearing, she was not the person he had served as Debra Miller.

Having interviewed the real Debra sometime before he made his allegedly erroneous service upon some other, unnamed, unidentified woman, it seems incredible that he could have served as the real "Debra" some other person. And it is equally incredible that, although Reiben's investigator took the affidavit of a man in New Jersey as to what Miller said to an audience in New Jersey, he did not take the affidavit of a proposed witness whose story, as related to Reiben, caused Reiben to click his heels in joy. In fact, the several statements made to the court by Reiben during the trial as to the witnesses he would call to prove that Miller was a liar and the testimony of the defendant's witnesses at the hearing are as incredible as the trial testimony of the defendant.

Withholding for the time being any discussion of the legal principles involved, the court is faced with what must be described (for the sake of understatement) as an "interesting" story. For, in order to accept the Ratnoff-Reiben version of events, the court must subscribe to what may best be characterized as the "imposter" and "coincidence" theories. First, the defendant asks the court to believe that Ratnoff served an imposter, masquerading as Debra who, *in addition*, just happened to tell Ratnoff the same story about what Paul allegedly told the boys, that the real Debra would tell the court nearly two years later at the hearing.

It seems superfluous to add that, at the hearing, the real Debra testified that she had never been served during the trial with any subpoena—in fact, that she had been absent from the eastern part of the United States during the entire period from February 1968–February 1969. This testimony was corroborated by Sol Shipotow, a souvenir salesman at various fairs around the country, (including Canada) with whom Debra has been living since she left Paul in 1967.

Two of the defendant's five claims revolve around an F.B.I. arrest report, dated February 4, 1966, which was prepared by McKenna following Miller's arrest on January 31, 1966. Defendant maintains that this report contains statements made by Miller which should have been but were not produced for the court's inspection as potential § 3500 material, following the direct testimony of Miller.

On the night of January 31, 1966, Agent McKenna, accompanied by agents Mulhall and Newquist, proceeded to Lefrak City, Queens, New York to arrest Miller pursuant to a warrant of arrest they had procured earlier that day. According to McKenna, his major goals that evening were to arrest Miller; to secure his confession, if possible; to obtain evidence. After arresting Miller, the agents proceeded to question him. Although they were in his apartment for a period in excess of an hour, the entire time was not spent in questioning. At first, Miller denied complicity in the venture for about 15 minutes. However, after being advised of the considerable evidence already in the Government's possession, he admitted his participation. He then turned over his records but the

agents, acting prudently, searched the apartment to ascertain whether any other records were concealed. After they had satisfied themselves on this score, they spent a good deal of time going over the records and the names listed therein. Miller specifically declined to give a full statement at this time; he discussed his dealings generally; was reluctant to give details, stating that he wanted to speak to his attorney before cooperating any further. Time was also spent in attempts by Mrs. Miller to communicate by telephone with her husband's attorney. During these discussions, McKenna and one or both of the other agents made notes. Although more than an hour was spent in the apartment it is clear that little time was spent in the actual questioning of Miller. McKenna,

having accomplished his predetermined goals, did not desire to press Miller further at that time.

The agents deposited Miller at the Federal House of Detention, West Street, New York, N. Y. for the night and McKenna returned to his office to begin preparation of the arrest report. He worked on the report that night and most of the next day, following a Commissioner's hearing that morning. The report was based on the notes he had taken in addition to the combined recollections of the three agents. McKenna completed his draft of the report on the evening of February 1, 1966 but, due to the late hour, did not submit that draft to the typist until the following morning. The final typed version, now in dispute, is dated February 4, 1966.[3]

---

3. The relevant portions of this report which could conceivably be 3500 material, which should have been turned over to the defendant, are as follows:

". . . On January 31, 1966, on the basis of this complaint, a warrant was issued by the United States Commissioner, Eastern District of New York, for the subject's arrest.

On the evening of the same date, January 31, 1966, PAUL GEORGE MILLER was taken into custody at his home at 98–32 57th Avenue, Apartment 6M, Flushing, New York, by SAS GEORGE G. MCKENNA, HARRY G. MULHALL and LAUREL B. NEWQUIST. PAUL GEORGE MILLER was informed by SA GEORGE G. MCKENNA of the identity of himself, HARRY G. MULHALL and LAUREL B. NEWQUIST as Special Agents of the Federal Bureau of Investigation. He was also informed by SA MCKENNA, that he was under arrest, pursuant to a warrant issued in the Eastern District of New York, and the filing of a complaint in that district, charging him with violation of the Selective Service Act.

This information was furnished to MILLER in the presence of his wife, who was in the apartment with him at the time.

SA MULHALL informed MILLER that he did not have to furnish any statement, that any statement he made could be used against him in a court of law, and that he was entitled to consult an attorney before making any

statement, and if he could not afford to pay for one, the judge would get one for him.

Mrs. MILLER then made two telephone calls in an attempt to get in touch with a lawyer but was unsuccessful.

MILLER was informed that the Federal Bureau of Investigation had taken statements from several individuals, to the effect that they had paid him large sums of money in exchange for his arranging to have their draft classifications changed from 1–A to 1–D.

MILLER for some ten minutes persisted in denying that he was involved in any such dealings, but finally stated that he wanted to consider the matter further and asked for time to recover somewhat from the shock of the Agents' visit.

MILLER was informed that the Agents were undertaking at once a thorough search of his apartment, incidental to his arrest. MILLER then admitted that he was involved in such dealings and had records pertaining to such dealings. He went into his bedroom and furnished from a night table, a black looseleaf notebook and a red notebook, which, he said, contained the names of many individuals involved in these dealings.

SA MULHALL opened the black notebook and, turning the pages, read off the names of GERALD GUTTERMAN, THOMAS FERRARA, LEWIS H. GEHLBERG, STEVEN ALLEN LIEBOWITZ, STEVEN BARRY

In light of McKenna's testimony at the hearing, the court is unwilling to say that the report evidences substantial selection of material, or that it contains McKenna's subjective impressions or that it was not prepared contemporaneously with the statements of Miller. See Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). Because of the failure of the prosecuting attorney to hand the report up to the court so that a viable determination as to its § 3500 character *vel non* could have been made at that time, the court will assume for purposes of this motion that the report was § 3500 material. In fairness to O'Brien, who neglected to hand up the report and in fairness to the defendant as well, the court feels impelled to trace the subsequent history of the report so that its failure to be produced at trial can be understood.

The report, or a copy thereof, was transmitted to the office of the United States Attorney for this district where it was kept in a master file of Miller cases. This master file was voluminous, concerning, as it did, a large number of indictments. The initial custodian of the report was Leonard Theberge, an Assistant United States Attorney, who, at that time, was in charge of prosecuting the Miller cases. When he departed the office, the Miller file was kept in the office of William Kelly, then the head of the Criminal Division. Copies of the report at issue were not kept in the individual file of any one of the Miller cases pending in the court. O'Brien testified at the hearing that he probably read the

KNOBEL and HOWARD WEISBLUM. MILLER stated he had brought about their reclassification and that of many others listed in his books, to a deferred status, by causing to be forwarded to their draft boards military reserve forms, which advised the boards that these individuals had been enlisted in the reserve. He explained that he himself did not handle or even see the forms that were used in this operation, but that someone else handled the job of sending the forms to the local boards. He stated that at this time he did not wish to go into detail about the operation and did not wish to identify other persons who worked with him on the operation. He wished first to discuss the matter with his attorney, after which he probably would tell the Agents the entire story, but he wanted to get the "go-ahead" first from his attorney. He declared that, when he identified the other people who were involved, the Agents would be shocked.

Asked what he had done with the money he had received, he replied that he had "blown" it on living expenses and shopping sprees.

In MILLER's bedroom closet a 1962 green diary was found. MILLER advised that this was his deceased father's diary. He remarked that his father had engaged in the same dealings as himself in connection with draft classifications, until his death two years ago. His father engaged in these dealings for eight years, prior to his death and he, PAUL MILLER, had received this thing as the only "inheritance" from his father.

A small black looseleaf notebook was also found in the bedroom closet and MILLER acknowledged that this was his, and that he had also used this book in connection with his reclassification dealings . . . "

"At the conclusion of the search of his apartment, MILLER was driven to the Federal House of Detention at 427 West Street, New York, New York. While en route, MILLER stated that he and his wife had got wind of the fact that the Federal Bureau of Investigation was investigating him, and only last night they had debated whether they should flee from the United States and go to Mexico. He decided not to flee. He stated that he knew it was only a question of time, that he was bound to be caught in the end. He asked, 'But why is it in over eight years you never caught my father?' "

. . .

A review of the large black looseleaf notebook found in MILLER's apartment showed the following listings:

. . .

210 Atlantic Lyn
LY 3-2132
RONALD AMES MAYERSOHN
103 Combs Ave.
Woodmere
30-6-42-1276
9-26-42
Local 6, V.S. . . . "

report sometime during his preparation of the *Mayersohn* case. However, at the close of Miller's direct testimony he forgot about this report and, consequently, did not hand it up along with the other potential § 3500 material. There is no doubt in the court's mind, indeed, the defendant does not urge, that this failure was due to anything other than negligence, rather than purposeful suppression. Nevertheless, negligent as opposed to intentional suppression of evidence can require a new trial if the requisite standards for a new trial are met. The court therefore turns to the standards laid down in Second Circuit decisional law regarding new trials in which the claimed newly discovered evidence has allegedly been suppressed by the Government.

*New Trials, Newly Discovered Evidence, and Prosecutorial Misconduct.*

Absent prosecutorial misconduct (a misnomer to the extent that it does not always imply willfulness) two tests have evolved for the granting of new trials on the basis of newly discovered evidence. The first, the so-called *"Berry"* test, requires, in addition to other elements not presently relevant, that the defendant convince the court that the new evidence "would probably" produce a different verdict upon retrial. Berry v. State, 10 Ga. 511, 527 (1851). The second test, based on Larrison v. United States, 24 F.2d 82, 88 (7th Cir. 1924), would require only that the defendant show that the newly discovered evidence "might" produce a different result on retrial.

The lesser *Larrison* test has been said to be applicable only in cases of recantation or where it has been proven that false testimony was given at the trial, United States v. Hiss, 107 F.Supp. 128, 136 (S.D.N.Y.1952), aff'd 201 F.2d 372 (2d Cir.), cert. denied, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953); United States v. Costello, 255 F.2d 876 (2d Cir. 1958), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). Despite the two differing tests, the Second Circuit has yet to define clearly the permissible ambit of each. *See* United States v. DeSapio, 435 F.2d 272, 286 (2d Cir. 1970).

Whichever test is applicable, it can be said that motions for new trials are not favored. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946); United States v. Lombardozzi, 343 F.2d 127 (2d Cir.), cert. denied, 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702 (1965); 2 Wright, Fed. Prac. and Proc. at 481–482, § 551 (1969). The judicial disdain for motions of this type stems from systematic considerations of the finality of judgments and, also, from the high proportion of frivolous motions of this type. However, in appropriate cases, i. e., those in which the interests of justice would be served, courts have not hesitated to grant these motions. A separable but related policy cuts across these general principles. Its basic premise is that the resources of the defendant are almost always miniscule compared to the investigative resources of the state. Due to this inherent imbalance, the defendant is almost always at a disadvantage in the preparation of his case. Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136 (1964). It is also clear that the function of the prosecutor encompasses far more than the securing of convictions. As a representative of the state it is his duty to see that justice is done. These two principles, when combined, yield the one general principle that now concerns us: that, in appropriate instances, the prosecutor owes a duty to advise the defendant of certain information that the prosecutor has in its possession, which would be favorable to the accused, and which the accused, due to his inferior resources, is unlikely to possess. *See*, e. g., Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct.

1173, 3 L.Ed.2d 1217 (1959); United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964).

If the prosecution has evidence favorable to the defendant which it does not make available to him either prior to or during the trial, the questions presented are more complicated than ordinary motions based solely on newly discovered evidence. When the defendant claims that the Government was to blame for his not having that evidence, i. e., that the Government suppressed that evidence, other policy considerations are important, and, consequently the standards for new trials, in certain cases, may be different from those for normal motions for new trials. What constitutes favorable evidence and when the prosecutor owes a duty to turn such evidence over to the defendant are difficult questions which the Second Circuit has sought to resolve in a series of cases. United States v. DeSapio, *supra*; United States v. Bonnano and Notaro, 430 F.2d 1060 (2d Cir. 1970); United States v. Silverman, 430 F.2d 106 (2d Cir. 1970); United States v. Polisi, 416 F.2d 573 (2d Cir. 1969); United States v. Miller, 411 F.2d 825 (2d Cir. 1969); United States v. Keogh, 391 F.2d 138 (2d Cir. 1968); United States v. Tomaiolo, 378 F.2d 26 (2d Cir.), cert. denied, 389 U.S. 886, 88 S.Ct. 159, 19 L.Ed.2d 184 (1967); Kyle v. United States, 297 F.2d 507 (2d Cir.), cert. denied, 358 U.S. 937, 79 S.Ct. 327, 3 L.Ed.2d 308 (1961); United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961).

In *Keogh, supra*, Judge Friendly attempted to categorize the apparently disparate assortment of cases of this type. One category is that of deliberate suppression. This class encompasses cases in which the prosecutor has not only withheld material evidence intentionally but also cases in which the prosecutor, although not intentionally, withholds evidence whose high value to the defense could not possibly have escaped his attention. The concern in these cases, therefore, is *not* the good faith or bad faith of the prosecution, but, rather, the prej-

udice to the defendant. In cases of this type, the defendant is almost invariably prejudiced by the evidence withheld. A second type of case is one in which the prosecution withholds evidence favorable to the accused, which is "material either to guilt or punishment," after the defendant has requested such evidence. This category includes *Brady* and its progeny. Again, the intent of the prosecutor is irrelevant; the prejudice to the defendant is the key. The importance of the request is that it serves to "flag" the importance to the defendant of the requested evidence—in this sense obviating the necessity for the prosecutor to attempt to determine what the defendant might deem useful to his case. The third, and least defined category, includes cases which do not fall within the ambit of the two just described, i. e., evidence that has not been requested and which is not of such obvious value that the prosecutor could not have missed it.

If the defendant can show that the claimed evidence falls into one of the first two categories, he must show less to prevail on his motion for a new trial. The test, as enunciated in *Miller, supra*, is ". . . whether . . . there was a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." 411 F.2d at 832. It is vital to bear in mind that (as to any category) the defendant must show more than the mere fact that favorable evidence was not made available to him, and that the prosecution had a duty to make that evidence available. He must show that the evidence withheld is "material and of some substantial use to the defendant." *Tomaiolo, supra*, 378 F.2d at 28; *Polisi, supra*; United States v. Annunziato, 293 F.2d 373 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); *cf.* Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); *cf.* United States v. Aviles, 337 F.2d 552 (2d Cir.), cert. denied *sub. nom*, Gigante v. U. S., 380 U.S. 906, 85

S.Ct. 885, 13 L.Ed.2d 794 (1964); *cf.* United States v. Raspovich, 241 F.2d 779 (2d Cir. 1957). Defendants invariably maintain that the claimed suppressed evidence falls within the first two categories, in order to avail themselves of the less stringent *Miller* test of materiality. The defendant so argues in the instant case, and the court now turns to the consideration of his four claims involving alleged prosecutorial misconduct.

### The § 3500 Material

Assuming, arguendo, that the report dated February 4, 1966 was § 3500 material, and that the Government's failure to produce it for the defendant, after all § 3500 material had been requested, would call into play the *Miller* (less rigid) standard of materiality, the court still denies the defendant's motion for a new trial, since he has not shown that the evidence would have been of any "substantial use" to him.

Defendant argues that:

"The absence of any mention by Miller in his initial interview that he had advised registrants of the nature of his fraudulent scheme would have been of immeasurable benefit to defense counsel in cross-examining him. This position is buttressed by Miller's admission at trial that Government agents may have mentioned to him that convictions were dependent upon proving that registrants were informed by him of the fraudulent nature of the DD44 Form, coupled with the fact that not until two weeks after the initial interview did he state to the F.B.I. that he so advised each of the registrants with whom he dealt."

(Fawer Post-Hearing Memorandum, p. 51)

Aside from the absolute insidiousness of the contention that Government agents told or insinuated to Miller that he should lie at the several trials of "Miller cases," (which in my opinion no juror would believe), the court fails to perceive how the reports could have aided the defendant in establishing that claim or in casting doubt on the truthfulness of the signed statement he gave on February 15th, in which for the first time he disclosed what he had told his customers about how the scheme operated. This signed statement was turned over to the defendant at the conclusion of Miller's direct testimony.[4]

---

4.
"February 15, 1966
New York New York

". . . I, PAUL GEORGE MILLER, hereby make the following voluntary statement to Special Agents GEORGE G. MC KENNA and JEAN E. REILLY, who have identified themselves to me as Special Agents of the Federal Bureau of Investigation (FBI). No threats or promises have been made to me to induce me to make this statement. Special Agent MC KENNA has advised me that I do not have to make a statement and that any statement that I make may be used against me in a court of law. Agent MC KENNA also advised me of my right to consult an attorney. As a matter of fact, I have come to the New York Office of the FBI following the advice of my attorney to furnish a full statement to the FBI.

I am 28 years of age, married and have an infant son, STEPHEN, and I reside with my wife and child at 98–32 57th Avenue, Apartment 6M, Queens, New York. I live in a housing development commonly known as Lefrak City. I am currently attending classes at the RCA Institute located at 1600 Broadway, New York, New York. I attend these classes five days a week. I am employed three nights a week, Monday, Wednesday and Thursday as a Credit Authorizer for Franklin Simon at 560 Washington Street, New York, New York.

My father, SIDNEY B. MILLER, died on January 8, 1963, while residing at 530 Church Avenue, Woodmere, Long Island, New York. For four, six or even possibly eight years before my father's death, he was engaged in a scheme to bring about the reclassification of Selective Service registrants into Class 1–D by causing to be forwarded to the individual registrant's Selective Service board Military Reserve Form DD 44. This form is used by the Military Reserve to notify a Selective Service Board that a registrant has been enlisted in the Reserve. Upon receipt of this form, the local board will reclassify a registrant into Class 1–D, signifying his mem-

**1362**

bership in a reserve component of the United States Armed Forces. For bringing about such a reclassification, my father would originally charge a certain fee which might run into the hundreds of dollars or more. When my father found a customer, he would notify his contact, a man named SOLOMON GOTTFRIED. This man had once been in the Reserves himself and had got hold of a large quantity of DD 44's. Upon notification from my father, GOTTFRIED would fill out the form with the name of the particular registrant involved and would mail it to the local board.

GOTTFRIED lives at 2 Elves Lane, Levittown, New York, and is employed in the Civil Service System of Nassau County, Long Island, doing some kind of work, I believe, connected with the school system.

SOLOMON GOTTFRIED is described as follows:

| | |
|---|---|
| Age | In his 50's |
| Height | About 5 feet 7 inches |
| Build | Stocky, but not obese |
| Eyes | Wears glasses |
| Hair | Balding, with salt and pepper hair |

GOTTFRIED's mother lives somewhere in the Bronx, New York, and he has one or more children now married who, I believe, are living in the state of Maine.

Shortly after my father's death on January 8, 1963, GOTTFRIED came to my home at 530 Church Avenue, Woodmere, Long Island, and asked if I wanted to take over my father's business involving draft reclassifications. He told me there was no sense in losing the deal. I agreed to continue with him in these dealings.

I wish to state that I don't know whether GOTTFRIED or my father first thought of this scheme or who initiated it. My father had introduced me to GOTTFRIED about six years or more ago. I have never been in his home, but I have met his wife. GOTTFRIED told me that he has a bank account at the Dime Savings Bank in Green Acres, Valley Stream, New York.

I have never seen the forms sent out by GOTTFRIED except that on one occasion GOTTFRIED did send me a tissue copy of such a form.

In the preparation of these forms, two typewriters were involved. GOTTFRIED had an old typewriter which some time

ago he told me he got rid of and he bought a new one.

About eight months ago, he ran out of the original DD Form 44's and he told me he went to a photographer or printer and had copies made up. I don't know who made them up for him.

Whenever I got a customer, I would call GOTTFRIED either at his place of employment or at home and furnish him with the name and the necessary details concerning the registrant who was interested in obtaining a 1–D classification. I would pay GOTTFRIED $200 for each form he sent out.

During the course of my dealings with GOTTFRIED, I entered notes in the books which the FBI seized in my apartment on the night of my arrest on January 31, 1966. I have been permitted by Agents MC KENNA and REILLY to examine these seized books in their presence, and I furnish below the following information concerning the entries and the persons whose names appear in the books.

I wish to emphasize that in each instance in which I dealt with the individual, I made clear to him that I had a contact who had in his possession Military Reserve forms and who, at my notification, would forward to the individual's local board one of these forms which would falsely advise the local board that the individual registrant had been enlisted in a Reserve Unit. In each instance, I advised the individual further that as a result of the receipt of this form at the local board, the board would shortly thereafter reclassify the registrant into category 1–D. I am vague about the precise time I dealt with the individuals involved, but in every instance it was after my father's death. The approximate time can be determined by checking the date of the receipt of the form DD 44 at the local board.

With respect to the names which I entered into my larger black looseleaf notebook, I state the following:

> GERALD GUTTERMAN
> 19 Bonnie Drive
> Westbury, New York
> Selective Service Number
> 30–5–42–1005

About two years ago, GERALD GUTTERMAN agreed to pay me $2,000 for a 1–D classification and he paid me the full amount. GUTTERMAN was a friend of my father and he was the

first individual for whom I did this sort of thing after my father's death.

RONALD AMES MAYERSOHN
103 Combs Avenue
Woodmere, New York
Selective Service Number
30–6–42–1276

HARVEY STEPHEN MORGAN
1261 Central Avenue
Far Rockaway, New York
Selective Service Number
50–39–42–402

I entered MORGAN's name in my red notebook under date November 3, 1965, and in my smaller black looseleaf notebook I made a notation indicating that he had been assigned to the 152nd Tactical Group with Air Force Number 1397800. MORGAN is my brother-in-law, being married to my sister, DENISE. He did not come to me and ask me to have him fictitiously assigned to the Reserves. It was I who came to him and proposed getting him a 1D Classification. He went along with the idea and I got him the classification. I called up my contact SOL GOTTFRIED and told him to send the Reserve Form to the Local Board concerning MORGAN. GOTTFRIED seemed to expect his usual payment of $200 but I did not give him anything for doing this. I said to him "Have a heart, he's my brother-in-law."

Thereafter Miller made a specific, signed statement with reference to the defendant Mayersohn on February 20, 1966 (dated February 23, 1966) which was also turned over to defendant's counsel and marked Exhibit 8 for identification. "On February 20, 1966, PAUL GEORGE MILLER voluntarily appeared at the New York office of the Federal Bureau of Investigation and furnished the following signed statement to Special Agents GEORGE G. MC KENNA and JEAN E. REILLY:

"New York, New York
February 20, 1966

"I, Paul George Miller, hereby make the following voluntary statement to Special Agents George G. McKenna and Jean E. Reilly, who have identified themselves to me as Special Agents of the Federal Bureau of Investigation. No threats or promises have been made to me to induce me to make this statement. Special Agent McKenna has advised me that I do not have to make a statement and that any statement I make may be used against me in a court of law. I have come to the New York Office of the Federal Bureau of Investigation following the advice of my attorney to furnish a full statement to the Federal Bureau of Investigation.

"I am 28 years of age, married, have an infant son and I reside with my wife and child at 98–32 57th Avenue, Apartment 6M, Queens, New York. I live in a housing development commonly known as Lefrak City.

"Since the death of my father on January 8, 1963, I have been engaged as he had been in the last six or seven years of his lifetime in a scheme to bring about the reclassification of Selective Service registrants into class ID by causing to be forwarded to the individual registrants Selective Service Board Military Service Form DD–44. This form is used by the Military Reserve to notify a Selective Service Board that a registrant has been enlisted in the Reserve. Upon receipt of this form, the Local Board will reclassify the registrant into Class 1D, signifying his membership in a reserve component of the United States Armed Forces. For bringing about such a reclassification I charged a certain fee. When I got a customer, I would notify my contact, Solomon Gottfried, a former Air Force Sergeant, who had obtained a quantity of DD–44s. Upon my notification, Gottfried would fill out the form with the name of the registrant involved and necessary data and would mail it to the Local Board. Upon receipt of the form, the Board would reclassify the registrant 1D.

"At the time of my arrest by Bureau Agents in my home on January 31, 1966, the Agents obtained a number of my notebooks in which I made entries pertaining to a scheme in which I was engaged with Solomon Gottfried of 2 Elves Lane, Levittown, New York. In this scheme I would pay Gottfried $200, and he would mail to a registrant Selective Service Board Form D–44, record of military status of registrant, upon my notification. Upon receipt of this form at the Local Board, the Board would reclassify registrant into category 1D on the basis of the fraudulent information contained in the form that the registrant had been enlisted in a military reserve component.

"In my black notebook which I maintained concerning my draft reclassification scheme, I made an entry: Ronald Ames Mayersohn, 103 Combs Avenue, Woodmere, New York, Selective Service Number 30–6–42–1276.

"Mayersohn, at the present time, is residing at 210 Atlantic Avenue, Lynbrook, New York.

"I entered his name in my black book because I had entered into a deal with

**1364**

Reiben waited for the end of cross-examination to ask Miller whether he might have been told by agents prior to trial of the necessity of mentioning DD44 forms in his trial testimony regarding what he told the boys. Miller did not deny the possibility that this might have been mentioned as one of the essential elements of the crime. However, the jury heard this testimony, and obviously rejected the inference which defendant wished them to draw therefrom. Now comes the defendant two years later arguing that if the report had been made available to him, he could have put that report to immeasurable use. The defendant's argument is that if he had had access to the agent's report of February 4, 1966, it could be used to disprove Miller's contention that he told his customers (including the defendant) of how his scheme worked and, also, that it could be used to bolster his argument that Miller's testimony on the stand was prompted by the instance of the F.B.I. that he testify as he did, contrary to the true facts. But that report indicates clearly that the F.B.I. already knew from statements of other registrants how Miller's scheme operated and that Miller was unwilling to state the details of his scheme until after he had had an opportunity to confer with his lawyer. And the fact is that he did make a full statement after he conferred with his at-

torney, Mr. Hammer. Had this report been turned over to the defendant and had his attorney used it on cross-examination, Miller's failure to give details on the evening of his arrest and the gap between that date and February 15th, the date of his first written statement, would have been thoroughly explained by the very report now claimed, in retrospect, to have been of immeasurable benefit to the defendant. The court fails to see how the defendant could have put this report to any "substantial use," *Tomaiolo, supra,* and does not find that the report, no matter how skilled the counsel to whom it would have been made available at the trial, could have been used to induce enough jurors to change their verdicts, *Miller, supra.*

Defendant also maintains that Miller's trial testimony, that he gave no statement to agents on the night of his arrest, was false testimony, known to the Government to be false and which the Government had a duty to correct. He argues that if O'Brien had corrected Miller's testimony on this score, defendant could have used this false testimony to impeach Miller's credibility. Defendant is not urging that Miller's testimony be considered perjury, see *Napue, supra,* nor is it arguable that O'Brien intentionally failed to correct this misstatement in light of his testimony at the hearing that he had completely forgotten about

him to get for him a 1D classification at his local draft board, in return for which he agreed to pay me $3,000. As I recall, at the time we made the deal Mayersohn had already received his draft notice.

"The deal was entered into at my house at 1261 Central Avenue, Far Rockaway, New York. Half of my fee was paid before I brought about the draft reclassification, and the other half was paid after Mayersohn received his 1D classification.

"Mayersohn was referred to me by someone whose identity I do not now recall. "I brought about the reclassification by notifying Solomon Gottfried, who upon my payment of $200 forwarded to the Local Board the fraudulent DD Form 44

advising the Board that Mayersohn had been enlisted in a military reserve component.
"I have read the above statement consisting of 2 pages. It is true and correct to the best of my knowledge and recolection.
"I have initialed each page & any changes I sign my name below
                              "/s/ Paul George Miller
"2/20/66 Witnessed:
        /s/ George G. McKenna
              Sp. Agent FBI, N.Y. N.Y.
        /s/ Jean E. Reilly, Special Agent
              F.B.I. N.Y. N.Y."
The Court of Appeals approved of the trial court's deletion of certain portions of the statements turned over to defendant's counsel, as not being within the ambit of § 3500 applicable to the Mayersohn case.

the agent's report. It is apparent that Miller misunderstood what Reiben meant by the term "statement," confusing it with the formal, signed statements that he gave subsequent to his arrest, the pertinent portions of all of which were turned over to the defendant as § 3500 material at the conclusion of Miller's direct testimony.

Had the agent's report been made available, it is most unlikely that Miller's veracity would have been impeached as to his testimony that he gave no statement on the night of his arrest.

This court does not believe that this information as to what he said on the night of his arrest, in the hands of skilled counsel would have avoided a conviction, assuming that the lower, *Miller* standard of materiality is applicable.

This conclusion is based in part on the court's opinion that the conviction of this defendant did not rest solely on the uncorroborated testimony of Miller as to what he told his customers. Defendant has argued, in his post-hearing brief, as he did at the trial, that this case must be considered as Miller v. Mayersohn. The credible evidence in this case, the highlights of which have been summarized in this opinion, aside from Miller's testimony, includes abundant evidence bearing upon the defendant's intent to avoid military service by any and all means and from which the jury could reasonably infer that the defendant knew that he had never become a member of any reserve unit as the result of his dealings with Miller. While Miller's testimony as to what he told his customers was not corroborated, there was substantial additional evidence which the jury undoubtedly considered in arriving at its verdicts.

The motion for a new trial, on the ground that the agent's report of February 4, 1966 was not made available to the defendant and the further ground that O'Brien failed to correct Miller's testimony that he gave no statement on the night of his arrest, is denied.[5]

5. At the conclusion of the hearing, Fawer suggested that there might be other potential § 3500 material that had not been made available to the defendant at the conclusion of Miller's direct testimony. There were hundreds of pages of agency reports and statements of Miller with specific reference to each of the numerous Miller cases previously tried and pending. Fawer agreed that Assistant United States Attorney Favorito (who was opposing the motion for a new trial) would read all this material and designate and hand up to the court for in camera inspection those pages of this voluminous material which, by any stretch of the imagination, might have constituted § 3500 material that should have been turned over to defendant's trial counsel.

Favorito submitted to the court all of this material, together with a forwarding letter of which the following is a copy:

. . . . .

"Pursuant to the direction of this Court, the Government submits herewith copies of FBI Reports concerning the Paul Miller investigation which were marked during the hearing as Government's Exhibit I, for identification.

| Date | Number of Pages |
|---|---|
| Jan. 25, 1966 | 13 |
| Feb. 4, 1966 | 23 |
| Feb. 21, 1966 | 11 |
| Feb. 28, 1966 | 146 |
| Mar. 10, 1966 | 56 |
| Apr. 1, 1966 | 9 |
| Apr. 4, 1966 | 7 |
| Apr. 19, 1966 | 105 |
| May 27, 1966 | 1 |
| Jun. 14, 1966 | 37 |
| Aug. 29, 1966 | 12 |
| Sep. 29, 1966 | 6 |

The Court is asked to consider the following statements of Paul Miller which were not produced at trial and which were incorporated in the foregoing reports:

| Report Date | Pages Numbered |
|---|---|
| Apr. 19, 1966 | 4, 6, 10, 41 |
| Jun. 14, 1966 | 1, 2, 3, 5, 9–12 |
| Aug. 29, 1966 | 4, 5A, 5B, 6 |

Please find one page from the administrative files of the Federal Bureau of Investigation, which contains a statement made by Paul Miller. Again, this statement is submitted to the Court, pursuant to the Court's direction.

It is submitted that the FBI reports concerning the Paul Miller investigation, marked Government's Exhibit I,

While in the usual case, the thrust of the Government's obligation to reveal evidence to the accused is premised on assisting the defendant in the pre-trial preparation of his case, *see* Note, 74 Yale L.J., *supra*; *Bonnano, supra*; *Polisi, supra*, there are instances in which the duty may extend to the trial itself. This extension is due to the possibility that information which originally need not have been turned over, may subsequently, in light of events at trial, take on added importance. The Second Circuit case that best illustrates this point is *Miller, supra*, a case heavily relied upon by the defendant. In *Miller*, the chief prosecution witness had been hypnotized prior to trial at the suggestion of the United States Attorney, who was present at and participated in the hypnosis. The purpose of the hypnosis was to attempt to refresh the memory of the witness, which had dimmed as to certain facts. At trial the identification of the defendant was a key issue, and much of the testimony elicited from the witness at trial had been covered while the witness was under hypnosis. Although the United States Attorney had made a memo of the hypnosis it was not turned over to the court when the defendant requested § 3500 material. The Second Circuit held that the events of the trial imposed a duty on the United States Attorney to reveal the hypnosis, and ordered a new trial on the theory that this added item, could have avoided a conviction if it were available to the defense. It is important to note that crucial to the Second Circuit decision was its belief that the Government's case, notwithstanding this withheld evidence, was weak and the court could not say that this added item was so unimportant that it could not have affected the jury's determination.

Defendant urges that the instant case is similar to *Miller*; that the events at trial placed a duty on the Government to reveal that Debra was not interviewed; that the failure to comply with this duty lowers the standard of materiality; that the defendant, with this lower standard applicable, is entitled to a new trial. The defendant admits however, that the Government was under no duty to interview Debra.

Despite defendant's contentions, he is incorrect on all his claims. To begin with, this case is far removed from *Miller, supra*. Here Debra Miller was not interviewed by the Government prior to the trial. Consequently, the Government had no idea what her testimony would be, if called at the trial. The defendant had never asked the Government to assist him in finding Debra, nor could the Government know what potential use the defendant intended to make of her testimony. It strains credulity for the defendant to argue on the one hand that the Government had no obligation to interview Debra, and then to say that it owed a duty to advise the defendant of that decision. The defendant claims that he thought that the real Debra had been interviewed and served and, now, two years later, is seeking somehow to hold the Government accountable for that alleged blunder, assuming that one believes Ratnoff's testimony as well as that of Debra Miller and her consort, Shipotow. Equally fatuous is the defendant's suggestion that he could have made use of the Government's failure to interview Debra at the request of Miller. Could defendant really have argued that Miller's request came as a

---

for identification, as well as the page from the administrative files of the Federal Bureau of Investigation are not 3500 material in the *Ronald Ames Mayersohn* case, and it is brought to the Court's attention only in the interests of justice."

. . . . .

The court has examined all of the material so designated and finds that none of it was § 3500 material.

The court is not directing that this material be sealed and held subject to the further order of the court because all of said material is clearly identified and will be held by the Government for any further in camera inspection, in the event of an appeal.

result of his knowing that she would contradict him? Or, is it more likely that Miller did not want to involve his family further in the marital situation that was already tense? The court does not find that this information would have been helpful to the defendant in any manner, and, further, that the Government owed no duty to advise the defendant of its decision not to interview Mrs. Miller. It is specious argument to shift the burden onto the prosecution by Monday morning quarterbacking, which is precisely what the defendant has sought to do in his post-hearing brief.

■ Of even less moment is defendant's contention that a new trial is warranted as a result of O'Brien's incorrect statement that the F.B.I. could not locate Debra, with its implied inference that it had been searching for her. Regardless of whether or not they were searching for her, the truth is that the Government had no idea where Debra was, could not have located her during the trial when the issue of her whereabouts was raised. O'Brien's misstatement was of no use to the defendant in finding her at that time, nor did it bear in any probative sense on the issues of this case. Furthermore, the question of Debra's whereabouts was not put to O'Brien before the trial. Rather, it was sprung on him indirectly at the last minute during the trial and his remarks cannot be regarded as a decision that he had "days or even weeks to consider whether a disclosure should be made" as to Debra's whereabouts and the Government's efforts to locate her, *DeSapio, supra.*

The court finds that the Government was under no duty to disclose that Debra's whereabouts were unknown or that Miller had requested the F.B.I. not to interview her; that the omissions in this regard were of no probative value whatever to the defense; that under no standard of materiality should a new trial be granted on these grounds.

*Motion for New Trial Based on Newly Discovered Evidence*

■ Defendant contends, notwithstanding the four claims of prosecutorial misconduct, that he is entitled to a new trial based on the testimony of the real Debra Miller that was adduced at the hearing and which, he claims is newly discovered. The essential elements that the defendant must show on motions of this type are that:

(1) the evidence must have been discovered since the trial;

(2) it must be material to the factual issues at the trial and not merely cumulative nor impeaching the character or credit of a witness;

(3) it must be of such a nature that it would probably produce a different verdict in the event of a retrial.

*Polisi, supra,* 416 F.2d at 576–577.

*See also* United States v. Faustin, 371 F.2d 820 (2d Cir.), cert. denied, 387 U.S. 935, 87 S.Ct. 2062, 18 L.Ed.2d 998 (1967); *Costello, supra.* As to "due diligence," a requirement of the first element, *see* United States v. Roberts, 388 F.2d 646 (2d Cir. 1968); United States v. Abrams, 357 F.2d 539 (2d Cir. 1966), cert. denied, 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966); United States v. Pellegrino, 273 F.2d 570, 572 (2d Cir. 1960).

The instant motion arguably fails to meet these three requirements. But, assuming that it did meet the first two, the court is satisfied that, if Debra testified at a re-trial, as she did at the hearing, her testimony would not probably produce a different verdict.

The secrecy to which Miller resorted when he interviewed selective service registrants at his home is reflected in Mrs. Miller's testimony at the hearing, referred to at page 1351 et seq., *supra.* The court has also considered her weak memory and her overt hostility towards her husband. It is obvious that she was

in the Miller apartment when he spoke to only six or eight of his numerous customers, over a period of years. Essentially, her testimony is negative, i. e., that she did not hear Miller mention a DD44 form or speak of submitting any false information to draft boards. Not having heard an entire conversation between Miller and any one of his customers; having heard "bits and pieces," her testimony does not negate that of Miller to the effect that he told his customers that false forms would be submitted in order that they might obtain a re-classification from 1–A to 1–D. Her testimony, at best, could be regarded only as tending to impeach Miller's credibility as to what he told his customers but does not constitute direct contradiction of Miller's testimony. Thus it fails to satisfy the second test set forth in *Polisi, supra.*

It also fails to meet the third test. Her testimony is so fragmentary, vague and inconclusive that the court is convinced that her testimony at a re-trial would not produce a different verdict.

The court has disposed of defendant's motion for a new trial taking the evidence adduced at the hearing in the light most favorable to the defendant, i. e., assuming that Ratnoff was actually told by Reiben to find and serve Mrs. Miller; that he attempted to do so; that he was thwarted by serving an "imposter"; that this imposter told him exactly the same story that the real Debra was to tell when she was ultimately found. This story, although accepted as true for purposes of the motion, is, at the very least, a strain on the court's credulity, and, were it not for the disposition of the case already made, the court would most likely deny the motion on the grounds that what the defendant says happened in fact never occurred and that defendant did not show due diligence in his attempt to find the real Debra Miller. On motions for new trials based on newly discovered evidence, the trial court is the judge of credibility, and, as such, has the right to disbelieve both Ratnoff and Reiben

as to their respective testimony. Weed v. United States, 380 F.2d 914 (10th Cir.), cert. denied, 389 U.S. 995, 88 S.Ct. 500, 19 L.Ed.2d 493 (1967); United States v. Bujese, 371 F.2d 120 (3d Cir. 1967); Casias v. United States, 350 F.2d 317 (10th Cir. 1965); United States v. Curry, 358 F.2d 904 (2d Cir.), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1965); United States v. Lewis, 338 F.2d 137 (6th Cir.), cert. denied, 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1964); United States v. Gantt, 298 F.2d 21 (4th Cir. 1962); United States v. Ratley, 284 F.2d 553 (2d Cir. 1960); United States v. Hurley, 281 F.Supp. 443 (D.Conn.1968); *cf.* United States v. Johnson, *supra.*

The court has a right to believe that any responsible attorney would have personally interviewed the claimed Debra. She was to be the defendant's most important witness, his ace in the hole so to speak. In addition, her claimed testimony was so vague and imprecise that any responsible attorney would have wanted to speak to her prior to trial so that he would know exactly what it would be. It is hard to believe that Reiben would have relied exclusively on the word of his investigator, who was not an attorney, without satisfying himself on that score. It is also a fair inference that, if Reiben had personally interviewed the person whom the defendant now claims was masquerading as Debra, it would not have taken him any length of time to discover that she was, in fact, an imposter. This, in turn, would have left him more time to find the real Debra, perhaps even to request assistance from the Government in locating her, in *advance of trial*, instead of springing her absence on the court at the last minute during the trial.

The fact that none of these preparatory steps were taken casts considerable doubt on whether any service was ever attempted on Debra in the first instance. If the court were so to hold, and disbelieve the Reiben-Ratnoff version of the events, it would hold that the testimony of the real Debra was not in fact newly

discovered, and that it could have been discovered with due diligence prior to the trial.

The motion for a new trial is denied. This is an order.